**The FOUKE COMPANY, a Delaware Corporation**

**v.**

**Marvin MANDEL, Governor, et al.**

**Civ. No. 73–1047–K.**

United States District Court, D. Maryland.

Dec. 5, 1974.

Stephen S. Boynton and McIntosh & Boynton, Washington, D. C., and J. Edward Davis and Weinberg & Green, Baltimore, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Md., Henry R. Lord, Deputy Atty. Gen., George A. Nilson, Asst. Atty. Gen., and Warren K. Rich, Sp. Asst. Atty. Gen., for defendants.

Fred Warren Bennett, Mt. Ranier, Md., for intervenor as party plaintiff, Fur Information and Fashion Council, Inc., d/b/a The Fur Conservation Institute of America and the American Fur Industry.

FRANK A. KAUFMAN, District Judge.

[1] This case involves the validity under the federal Constitution of article 66C, section 125A of the Maryland Code, a criminal statute. prohibiting importation of sealskins into Maryland for commercial purposes. Plaintiff, The Fouke Company (Fouke), a Delaware corporation with its principal place of business in South Carolina, processes and auctions sealskins. Fur Information and Fashion Council, Inc. (FIFC),[1] a trade association, seeks leave to intervene as a party plaintiff pursuant to Fed.R.Civ.P. 24. That intervention is hereby permitted.[2]

Fouke and FIFC by amended complaint seek declaratory relief and ask this Court to hold that Congress has preempted the subject matter covered by section 125A. Defendants have filed a motion to dismiss (converted to a motion for summary judgment by Fouke and FIFC by submission of affidavits[3]),

---

1. Doing business as the Fur Conservation Institute of America and the American Fur Industry.

2. FIFC does not seek intervention as of right under Federal Civil Rule 24(a). In granting the intervention sought under Rule 24(b), this Court has noted that, to date, Fouke has well presented all the arguments advanced by FIFC and that there is no indication of a divergence of interest between Fouke and FIFC or any that is likely to appear. Nonetheless, no party to this litigation is similarly situated to FIFC, and no disruption of the judicial process will result from FIFC being permitted to intervene. Of course, this Court would not and could not grant permissive intervention if FIFC did not have standing, but in this Court's opinion it possesses the same. See the discussion p. 1353 *infra* in the body of this opinion.

3. See Federal Civil Rules 12(b) and 56.

challenging the standing of Fouke and FIFC to bring suit, and contesting plaintiffs' claim of preemption. Fouke and FIFC in turn also seek summary judgment. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337.[4] Since plaintiffs rest their claim solely on the Supremacy Clause, their challenge to the Maryland statute does not require the convening of a three-judge court pursuant to 28 U.S.C. § 2284. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). *See* Hagans v. Lavine, 415 U.S. 528, 533–535 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Additionally, a three-judge court is not required herein since only declaratory relief is sought. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 152–155, 83 S. Ct. 554, 9 L.Ed.2d 644 (1963); *see* Steffel v. Thompson, 415 U.S. 452, 457 n. 7, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

4. Originally, in this case, plaintiffs raised equal protection and due process as well as Supremacy Clause claims. However, plaintiffs have abandoned all contentions other than those based upon the Supremacy Clause. Thus, the question arises as to whether claims stated solely under that clause "arise . . . under the Constitution, laws, or treaties of the United States", as those words are used in 28 U.S.C. § 1331. *See* Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936), in which Mr. Justice Cardozo, citing Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 56 L.Ed. 1205 (1912), stated (at 114) that a suit arises under federal law when "it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law." *See generally* C. Wright, Law of Federal Courts 54–59 (2d ed. 1970). Accordingly, although this Court's research has disclosed no case in which a Supremacy Clause challenge to a state statute, standing alone, has been held to "arise under" federal law, and although this Court notes Professor Wright's statement that "it cannot be said that any clear test has yet been developed to determine which cases 'arise under' the Constitution, laws, or treaties of the United States", C. Wright *supra* at 54–55, there would seem to be no reason why such a Supremacy Clause claim does not so arise. *Cf.* the statement in Swift & Co. v. Wickham, 382 U.S. 111, 125, 86 S.Ct. 258, 266, 15 L.Ed.2d 194 (1965), that "to be sure, any determination that a state statute is void for obstructing a federal statute does rest on the Supremacy Clause of the Federal Constitution", and the inclusion of that quotation in Hagans v. Lavine, 415 U.S. 528, 533–535 n. 5, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). As to the $10,000 jurisdictional requirement of section 1331, Fouke and FIFC have each individually alleged facts which would seem to meet that requirement under the test set forth in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 286, 82 L.Ed. 845 (1938).

It would also appear that federal jurisdiction in this case exists pursuant to 28 U.S. C. § 1337, which imposes no jurisdictional amount requirement, Hales v. Winn-Dixie Stores, Inc., 500 F.2d 836 (4th Cir. 1974), citing, at 840, W. Barron & A. Holtzoff, Federal Practice & Procedure § 38, at 200–03 (Wright ed. 1961); 7B J. Moore, Federal Practice J.C. 518 (1966), and cases cited thereat. Section 1337 provides for original district court jurisdiction over "any civil action or proceeding arising under any *Act of Congress regulating commerce* or protecting trade and commerce against restraints and monopolies." (Emphasis added.) Professor Moore has suggested that the "arising under" language of section 1337 is to be construed similarly to identical language contained in section 1331. 1 J. Moore, Federal Practice ¶ 0.60 [8.–3], at 626–27 (1974). Moreover, the Fur Seal Act of 1966, 16 U. S.C. § 1151 et seq., and the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 et seq. (1974 Supp.) (hereinafter MMPA) seem to qualify as acts "regulating commerce" within the contemplation of 28 U.S. C. § 1337. *See* Hales v. Winn-Dixie Stores, Inc., *supra* 500 F.2d at 841. The Interim Convention on Conservation of North Pacific Fur Seals (hereinafter Convention) itself would not seem to be an "Act of Congress regulating commerce". Thus, a Supremacy Clause challenge to a state statute based solely upon conflict with the Convention might not qualify under section 1337. However, that question need not be reached herein since this Court will exercise herein its discretionary authority to entertain on a pendent jurisdictional basis that challenge as one which is intertwined with the two other preemption challenges relating to the Fur Seal Act of 1966 and the MMPA. As indicated, section 1337 jurisdiction exists as to those two latter challenges.

Because this Court concludes that jurisdiction exists under sections 1331 and 1337, plaintiffs' additional allegation that jurisdiction exists pursuant to 28 U.S.C. § 1343 will not be considered herein. *See* Hagans v. Lavine, *supra* at 533–535 n. 5, of 415 U.S., 94 S.Ct. 1372, 39 L.Ed.2d 577.

I. *The Statutes Involved.*

The statute challenged by plaintiffs, 6 Md.Ann.Code art. 66C, § 125A (1974 Supp.) was enacted in 1973, and provides:

§ 125A. *Importation or possession with intent to sell of dead body, etc., of seal.*

(a) It is unlawful to import into this State for commercial purposes, to possess with intent to sell, or to sell within the State, the dead body, or any part or product thereof, of any seal.

(b) However, this act does not prohibit the sale or the possession with intent to sell of any part or product of any seal when the seller can demonstrate that the part or product was imported into this State before the effective date of this act; nor does it prohibit the sale of a part or product of a seal by an individual not normally engaging in this type of commercial sale, so long as the part or product was originally possessed and used by the seller for his own private purposes. This act also does not prohibit the importation of a seal, or any part or product thereof so long as this is done for legitimate zoological, educational, or scientific purposes.

(c) Any person who violates any provision of this section shall be guilty of a misdemeanor and upon conviction shall be fined for each violation not more than one thousand dollars ($1,000.00) or imprisoned for six months, or both fined and imprisoned at the discretion of the Court.

Plaintiffs claim that the Interim Convention on Conservation of North Pacific Fur Seals (hereinafter Convention), the Fur Seal Act of 1966, 16 U.S.C. § 1151 et seq. (1974 Supp.), and the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 et seq. (1974 Supp.) (hereinafter MMPA), either individually or in combination, preempt the field of law covered by the Maryland Act.

The Convention is a four-party[5] prohibition on pelagic sealing (hunting seals at sea) in the North Pacific. It permits restricted land sealing in the North Pacific for commercial purposes by the United States and the Union of Soviet Socialist Republics, with Canada and Japan each to receive fifteen percent of each of the first two countries' landsealing catch. Importation of any sealskins obtained by pelagic sealing in the North Pacific, into the territory of any signatory to the Convention, is prohibited.[6]

The MMPA establishes a moratorium on the taking and importation of marine mammals unless permitted by the Secretary of the Interior. 16 U.S.C. § 1371(a), (c). Section 1371(c) permits the Secretary to grant hardship exemptions if those exemptions do not extend beyond October 21, 1973. Section 1383 states that the MMPA is to be deemed not to contravene any treaty or convention. Section 1379(a) generally prohibits States of the United States from adopting or enforcing "any law or regulation relating to the taking of marine mammals within its jurisdiction", unless "the Secretary determines, after review thereof, that such laws and regulations will be consistent with" provisions of the MMPA or rules or regulations promulgated pursuant thereto.[7]

---

5. The United States, Canada, Japan and the Union of Soviet Socialist Republics.

6. To implement that provision and other provisions of the Convention, Congress enacted the Fur Seal Act of 1966 banning the importation into the United States of any fur seal

or fur seal part covered by the Convention except to the extent that exceptions are provided by the Act or by applicable federal regulations.

7. Section 1379 is set forth in full, *infra*, at p. 1359.

## II. *Standing.*

### A. *Fouke*

■■ The facts in this case are not in dispute. Fouke processes and auctions sealskins on behalf of the Convention's four signatories, the Union of South Africa,[8] and private shippers, deducting its fee from the price remitted to the seller. Fouke does not take title to such skins except when it buys certain skins for its own use. Other furs handled by Fouke in the United States and originating outside thereof are sold by Fouke in the United States to manufacturers, fabricators and wholesalers who in turn sell to retailers. Prior to the enactment of the Maryland Act, several retailers in Maryland purchased sealskin products originally auctioned by Fouke within the United States, *i. e.,* in South Carolina, but not in the State of Maryland. None of the manufacturers, fabricators, and wholesalers who purchase the skins apparently prepare them in Maryland or otherwise import sealskins into Maryland except for sale to retailers. Both parties agree that Fouke is not prosecutable under the Maryland Act for its activities to date in the normal course of business. Against the background, the standing issue present in this case must be decided.

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. * * *

Sierra Club v. Morton, 405 U.S. 727, 731–732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), Mr. Justice Douglas formulated a two-pronged standing test: (1) "the 'case' or 'controversy' test" (at 153, at 830 of 90 S.Ct.), *i. e.,* "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise" (at 152), and (2) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (*Id.* at 153, at 830 of 90 S.Ct.)[8]

---

8. Fouke received a hardship exemption under the provisions of 16 U.S.C. § 1371(c) to import 50,500 sealskins from the Union of South Africa in 1973. It currently has pending an application for a ten-year exemption to import approximately 60,000 sealskins per year from South Africa under section 1371(a)(3)(A). That section is set forth at pp. 1357–1358 *infra.*

8. In Whitley v. Wilson City Board of Education, 427 F.2d 179, 181 (4th Cir. 1970), Judge Craven applied *Data Processing's* "twofold requirements for standing to sue recently set forth by the United States Supreme Court" in a case which, like this one, did not, as did *Data Processing* and its companion case, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), arise under section 10 of the Administrative Procedure Act, 5 U.S.C. § 702. The first prong of that test would appear basic in the context of any standing question. Whether or not the second or "zone of interests test" is always applicable in determining standing questions, this Court will assume that it is applicable herein and that plaintiffs herein must therefore meet the standard stated in Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), quoting from Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), namely, that "[t]he 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" Recent Supreme Court cases discussing and applying standards as to standing include, *e. g.,* Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); United States v. Students Challenging Regulatory Agency Proceedings, 412 U.S. 669, 680 n. 9, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

For the period 1963–1973, Fouke has imported into, and processed and auctioned in, the United States sealskins as follows:

### Total Skins Received

| Year | Skins |
|------|-------|
| 1963 | 126,719 |
| 1964 | 88,905 |
| 1965 | 92,174 |
| 1966 | 83,685 |
| 1967 | 124,742 |
| 1968 | 122,051 |
| 1969 | 104,857 |
| 1970 | 110,095 |
| 1971 | 78,130 |
| 1972 | 98,520 |
| 1973 | 77,306 |

Fouke, as of May 15, 1974, had on hand in the United States 50,400 skins belonging to the Government of the United States to be sold at four auctions between October 1974 through April 1976. It is also possible that Fouke will receive from the United States Government another 6000 skins for sale. Fouke, on May 15, 1974, had on hand in the United States an additional 100,000 skins from Canada, Japan, South Africa, the U.S.S.R., and private shippers to be sold at three auctions from October 1974 to October 1975. At its last auction in April 1974, Fouke sold all skins offered by it. In its contracts with the four signatories, Fouke has a minimum compensation provision. Fouke also has the right to renegotiate its contract with the United States if the American share of the harvest falls below 26,000 skins. The contracts with all signatories are on an annual basis, except for Canada, whose contract covers the 1974 harvest. The contracts with South Africa and private shippers are apparently for a long term.[9]

The precise percentage of Fouke-processed and Fouke-sold skins sold in Maryland has not been made known to this Court. Four retailers sold finished seal products in Maryland for the period November 1, 1970 to July 1, 1973 (effective date of the Maryland Act):

Leonard Furs, Inc.
Tarlow Furs
Peltz Furs, Inc.
Furs-by-Gartenhaus

For two of the retailers, Leonard Furs, Inc. and Peltz Furs, Inc.,[10] the dollar value of finished sealskin products sold is as follows:

Leonard Furs, Inc.

| Dates | Sold ($) | Sold (# of coats) |
|-------|----------|-------------------|
| 11/1/70–10/31/71 | 11,175.00 | 11 |
| 11/1/71–10/31/72 | 1,150.00 | 1 |
| 11/1/72–10/31/73 | 1,095.00 | 1 |

Peltz Furs, Inc.

| Dates | Sold ($) | Sold (# of coats) |
|-------|----------|-------------------|
| 11/1/70–10/31/71 | 2,850.00 | 2 |
| 11/1/71–10/31/72 | 1,295.00 | 1 |
| 11/1/72–10/31/73 | 1,450.00 | 1 |

Those furs were apparently Fouke-processed and auctioned sealskins.

For the total period from 1970 to 1973, Fouke spent $575,414.00 on advertising in national magazines which are distributed in Maryland and elsewhere in the United States. Additionally, Fouke's Fashion Coordinator spent $99,372.00 for that period in the eastern states, including Maryland.[11] Nothing

---

9. Fouke has had processing contracts with the United States since 1915; Canada, 1944; Japan, 1954; U.S.S.R., 1970; South Africa and private shippers, 1924.

10. Tarlow Furs and Furs-by-Gartenhaus have, in accordance with their own desires, taken no part in this litigation. As to them, no information relative to their sealskin sales has been submitted.

11. Article VII of Fouke's contract with the United States provides, inter alia:

The Contractor will continue to develop the market for processed sealskins through the use of, but not limited to, merchandising and promotional work with brokers, dealers, manufacturers, wholesalers, and retailers, and will conduct market surveys, lectures, and general visits with the trade with a view to promoting greater understanding, consumer acceptance, and interest in the use of processed sealskins. Such promotion and development also will include recognized methods of advertising and means and methods designed to create and stimulate the interest and the sponsorship of fashion designers, couturiers, and editors, both in this country and abroad, in order to develop further the use of the product in its finished form. The Contractor's general program of advertising and promotion will be re-

in the record establishes clearly the dollar amount that Fouke received for the skins used in those coats sold in Maryland during that period.[12]

Fouke's injury is indirect in a market sense since the skins pass through one or more middlemen before reaching the retailers. But the chain is definite and certain and Fouke's interest is not too indirect or removed for Article III standing. Even though middlemen purchasing from or through Fouke might succeed in selling to others seal products which would have been retailed and bought in Maryland but for the Maryland Act, nothing in the record indicates that they could not sell to those non-Maryland purchasers and also at the same time sell to Maryland purchasers. Even if the supply is finite, and at some time may not keep up with the demand, nothing indicates that other American or international markets are more lucrative than the Maryland market, nor that the reduction of demand by the closing of the Maryland market has not reduced the number of end-buyers and users and/or affected the market price in other markets.

The State of Maryland notes that to date only California[13] and Maryland have banned importation of sealskins, and argues that so long as demand does outstrip supply, Fouke has suffered no injury. Under that logic, Fouke may sue only if and when a sufficient number of states or foreign jurisdictions prohibit sealskins and even then it could challenge only so many of the statutes as would again readjust the supply-demand balance. Standing requirements are and should be strict, but they are hardly that strict. In this Court's opinion, Fouke has shown sufficient economic injury in fact in this case. *Compare* Tupman Thurlow Co. v. Moss, 252 F.Supp. 641 (M.D.Tenn.1966). Thus, the first of the two-pronged tests of *Data Processing* is met.

As to the second *Data Processing* test, Fouke admittedly is not within the zone of interests of the Maryland statute, since Fouke itself does not import skins or seal parts into Maryland and thus, being not prosecutable under the statute, does not fall within the class of persons the statute purports to regulate.[14] Fouke nonetheless meets that second *Data Processing* test if it is within the zone of interests of a federal statute or a treaty on which it relies to attack the Maryland statute.[15] In *Sier-*

---

viewed by the Contracting Officer at his request from time to time. Furthermore, the Contractor's annual advertising and promotion budget shall be subject to the prior approval of the Contracting Officer.

12. The plaintiff has alleged, however, sufficient information with regard thereto to meet the tests set forth in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 286, 82 L.Ed. 845 (1938), insofar as the $10,000 jurisdictional requirement of section 1331 is concerned. *See* n. 4 *supra.* In any event, while the amount lost might in a given case be so infinitesimal that a court might conclude that a complaining party lacks standing, Fouke's substantial economic interest in the outcome of this case is otherwise well established by the undisputed facts herein.

13. Calif.Penal Code § 653q (1971) provides that "[i]t is unlawful to import into this state for commercial purposes, to possess with intent to sell, or to sell within the state, the dead body, or any part or product thereof, of any seal."

14. Fouke's nonprosecutability under the Maryland Act presents special standing problems peculiar to challenges to state criminal statutes in federal courts. Those problems are discussed *infra* at pp. 1350–1352.

15. Fouke may not rely on the Supremacy Clause itself as the basis for challenging the Maryland statute. As noted, however, in Swift & Co. v. Wickham, 382 U.S. *supra* at 120 at 263 of 86 S.Ct.:

\* \* \* Any such pre-emption [as that involved in *Swift*] or conflict claim is of course grounded in the Supremacy Clause of the Constitution: if a state measure conflicts with a federal requirement, the state provision must give way. \* \* \* The basic question involved in these cases, however, is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes. \* \* \*

*ra Club, supra,* Mr. Justice Stewart restated the zone of interests tests as follows (at 733 of 405 U.S., at 1365 of 92 S.Ct.):

> * * * where the alleged injury was to an interest *"arguably* within the zone of interests to be protected or regulated" by the statutes *that the agencies were claimed to have violated.* [Footnote omitted; emphasis added.]

Fouke is arguably within the zone of interests of the MMPA, the federal statute it claims the Maryland Act violates. Fouke has been granted an exemption pursuant to section 1371(a)(3)(A) of that Act for South African seal furs. Accordingly, it is rather clearly a company which Congress meant to regulate. Whether Fouke is arguably within the zone of interests of the Convention is a far closer question. The Convention is primarily concerned with land and sea sealing in the North Pacific—an activity in which Fouke is apparently not engaged. The treaty's concern with importation of fur seals—a Fouke activity —is limited to prohibition of importation of contraband North Pacific fur seals. Yet, as evidenced by Fouke's contracts with the Convention's signatories, it is arguably a purpose of the United States and the other signatories that fur seals taken pursuant to the Convention enter the commercial stream. While nothing in the Convention establishes that Fouke or any other American firm will or should be the conduit for such furs, or that American markets will or should be open for commercial sale of fur seals, those questions apparently bear on preemption rather than standing. At the least, Fouke is *arguably* an adjunct or incidental party to the implementation of the Convention, and accordingly will be permitted herein to press a claim based on the Convention. Whatever hesitation this Court may have in finding standing on that issue is resolved by its awareness that in deciding standing a court should not decide the legal merits of the substantive claim, but should only determine whether the "zone of interests" or "nexus" is sufficiently colorable that the plaintiff's claim supplies the concreteness and adversity the court requires before a claim passes muster under the strict standards of Article III.

Even though Fouke satisfies both prongs of the *Data Processing* standards, the question arises as to whether Fouke nevertheless lacks standing because it cannot be prosecuted under the Maryland statute. But the case law would appear to teach to the contrary.

In Truax v. Raich, 239 U.S. 33, 36 S. Ct. 7, 60 L.Ed. 131 (1915), Raich, a native of Austria, had been told by his employer that he would be fired after Arizona enacted a criminal statute imposing on employers a quota on the number of aliens they might carry on their payroll. Raich himself could not be prosecuted under the challenged section of the statute, so long as he did not misrepresent his citizenship or native origin. Mr. Justice Hughes noted (at 39) that to deny Raich standing would be to deny him an "adequate remedy". Raich was held to have standing even though there was there a potential plaintiff—the employer—who could be prosecuted under the Act, and against whom, at the time the case reached the Supreme Court, Arizona had brought charges since Raich had not yet been discharged.

Ten years later, the Supreme Court granted standing to a private school corporation seeking to challenge Oregon's Compulsory Education Act of 1922, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), although the Oregon Act's penalties applied only to parents and guardians of schoolchildren. Despite the fact that the Act was not yet being enforced to

While *Swift & Co.* did not address standing, those comments seem relevant in a case in which Fouke is claiming through the Supremacy Clause and is relying on a federal statute and/or a federal treaty which Fouke asserts is designed for its protection or regulation.

plaintiff's detriment, Mr. Justice Mc-Reynolds, noting the State's declared intent to do so, emphasized the devastating effect enforcement could be expected to have on the plaintiff.

Writing for the Court in Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L. Ed.2d 989 (1961), Mr. Justice Frankfurter, while concluding that standing in that case was lacking, cited *Truax* and *Pierce*, and stated in dicta (at 508, at 1758 of 81 S.Ct.):

> \* \* \* It is true that this Court has several times passed upon criminal statutes challenged by persons who claimed that the effects of the statutes were to deter *others* from maintaining profitable or advantageous relations with the complainants. \* \* \* [Emphasis added.]

Fouke fits the mold of *Truax* and *Pierce* and the dicta of *Poe*. It suffers sufficient economic injury if the statute is enforced, and has no other remedy but the one it seeks in this Court, other than perhaps to depart from its regular course of business and commence doing business in Maryland in order to invite criminal prosecution, a course the law should hardly sensibly require it to pursue.

In Linda R. S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the mother of an illegitimate child sought to require a state's attorney to enforce Texas' child-support statute which Texas had interpreted as inapplicable to fathers of illegitimate children. In the course of holding that standing was not present, Mr. Justice Marshall wrote (at 619, at 1149 of 93 S.Ct.):

> The Court's prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution. \* \* \* [I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another. \* \* \*

But Mr. Justice Marshall also wrote (at 617–618, at 1149 of 93 S.Ct.):

> \* \* \* [W]e hold that, in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks to justify judicial intervention. To be sure, appellant no doubt suffered an injury stemming from the failure of her child's father to contribute support payments. But the bare existence of an abstract injury meets only the first half of the standing requirement. "The party who invokes [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some *direct* injury *as the result of* [a statute's] enforcement." Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) (emphasis added). See also Ex parte Levitt, 302 U.S. 633, 634 [58 S.Ct. 1, 82 L.Ed. 493] (1937). As this Court made plain in Flast v. Cohen, supra, a plaintiff must show "a logical nexus between the status asserted and the claim sought to be adjudicated. . . . Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power." Id., [392 U.S.,] at 102 [88 S.Ct. 1942, at 1953, 20 L.Ed.2d 947].

Here, appellant has made no showing that her failure to secure support payments results from the nonenforcement, as to her child's father, of Art. 602. Although the Texas statute appears to create a continuing duty, it does not follow the civil contempt model whereby the defendant "keeps the keys to the jail in his own pocket" and may be released whenever he complies with his legal obligations. On the contrary, the statute creates a completed offense with a fixed penalty as soon as a parent fails to support his child. Thus, if appellant were

granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative. Certainly the "direct" relationship between the alleged injury and the claim sought to be adjudicated, which previous decisions of this Court suggest is a prerequisite of standing, is absent in this case.

In this case the nexus between the injury claimed and the relief sought is not —as in *Linda R.S.*—speculative. In contrast to *Linda R.S.*, if the statute is enforced, Fouke loses an ultimate market for the furs it processes and auctions; if it is struck down, an additional market is open. In the light of the analysis in *Linda R.S.* and the long standing authority of *Truax* and *Pierce*, the fact that Fouke is not currently prosecutable in Maryland under the challenged Maryland statute does not deprive Fouke of standing to press that challenge.

 Further standing-type issues are suggested by Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the related cases decided on the same day as *Younger*, and their progeny. It is true of course that the federalism and comity considerations discussed in *Younger* in the context of abstention would appear to have little bearing on the traditional standing emphases on concreteness and adversity and upon qualification of the particular plaintiff as a proper party. Additionally, Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), has dispelled any possibility that the Court should abstain in this case, since *Steffel* stands for the proposition that consider-

ations of comity and federalism do not prevent a federal court from entertaining a suit for declaratory relief to declare a state criminal statute unconstitutional if no prosecution is pending against the plaintiff and if the plaintiff otherwise has such sufficient standing that he presents a "live and acute controversy." 415 U.S. at 459, 94 S.Ct. 1209.[16] However, in Younger v. Harris, *supra*, and in the companion case of Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 969 (1971), and in other cases decided on the same day, the Supreme Court considered standing issues as well as the requirements of abstention. Plaintiffs in *Boyle*, and plaintiffs Dan, Hirsch and Broslawsky in *Younger*, like Fouke, had not been threatened with prosecution. *See Boyle* at 80, 81, 91 S. Ct. 758; *Younger* at 39–41, of 401 S.Ct., 91 S.Ct. 746. There, however, the resemblance stops, since Dan and Hirsch desired to engage in the same activities which they claimed the state statutes prohibited, and Fouke does not. It was always available to Dan and to Hirsch to perform those activities, and then, if prosecuted, to litigate in defense the statutes' unconstitutionality. Fouke, on the other hand, does not desire or intend to engage in the activities section 125A punishes. Moreover, until plaintiffs in *Younger* and *Boyle* engaged in those activities, it could not be ascertained whether they would be prosecuted; accordingly, the injury was speculative. By contrast, so long as the Maryland statute inhibits retailers from selling sealskin products, the injury to Fouke is definite and concrete. Finally, in *Younger* and in *Boyle,* the challenges to statutes were broad, uncertain, facial challenges. It was not clear what acts the plaintiffs would have undertaken, or

16. This Court notes, without deciding, that when a criminal statute is attacked on grounds that federal law is supreme, the federal courts may have a somewhat altered role in the design of federalism and comity than Mr. Justice Black outlined in *Younger*. In that connection, it should be noted that the MMPA—one of the bases of Fouke's challenge—may impose a civil penalty. 16

U.S.C. § 1375. While this Court also does not reach that issue herein, it is apparent that if that penalty is a "penalty" within the meaning of 28 U.S.C. § 1355, see Hales v. Winn-Dixie, 500 F.2d 836 (4th Cir. 1974), then the federal courts would have exclusive jurisdiction for its enforcement and thus, seemingly, primary responsibility for its interpretation.

whether the prosecutor would have claimed, or the state courts would have held, that the challenged statute was applicable to the challenging plaintiff who committed those acts. Those problems are not present herein.

In sum, this Court concludes Fouke has been injured in fact by the challenged statute, that it is within the zone of interests regulated by the federal statute and/or treaty on which it relies for its challenge, that the other earmarks of standing necessary to assure concreteness and adversity are present, and, finally, that Fouke's nonprosecutability under the statute does not pose a bar to standing in this case.

### B. *FIFC*

While FIFC, as a trade association, has additional standing hurdles to jump over, *see* Sierra Club v. Morton, *supra,* it is able so to do. Two of its members, Peltz Furs, Inc. (Peltz) and Leonard Furs, Inc. (Leonard), are Baltimore retailers which have in the past sold sealskin products. Another of its members, Schwartz & Kreinig, Inc., a New York corporation, has in the past sold seal furs to Maryland retailers. FIFC's allegations that those retailers have been damaged because of their inability to sell sealskin coats in the future as they have done in the past establish a concrete basis upon which Fouke may base its challenge herein. It is true that, unlike Fouke, Leonard, Peltz and Schwartz & Kreinig could be prosecuted if they chose to resume dealings. To date they have not been threatened with prosecution, but if they resumed retail sale of sealskin products in Maryland, such resumption would necessarily involve actions prohibited by section 125A.

FIFC does not challenge that statute on grounds of overbreadth or vagueness. Nor do any of the parties suggest that the statute is either unconstitutional or contains constructional ambiguities which if resolved by state judicial gloss would eliminate the danger of its application to FIFC's Maryland members. Accordingly, Leonard, Peltz and Schwartz & Kreinig would seemingly have standing to sue in their own right. Steffel v. Thompson, *supra.* In Sierra Club v. Morton, *supra,* Mr. Justice Stewart raised the possibility that an association had standing to sue when some or all of its members were allegedly injured in fact in some manner beyond the type of injury suffered by the general citizenry. Mr. Justice Stewart's *Sierra Club* dicta seemingly became a holding in United States v. Students Challenging Regulatory Agency Proceedings, *supra.* FIFC meets those requirements and accordingly has standing to sue.[17]

### III. *Preemption.*

#### A. *General Discussion.*

In Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230–231, 67 S. Ct. 1146, 1152, 91 L.Ed. 1447 (1947), the Supreme Court set forth the guidelines for determining whether state statutes or regulations are preempted:

> Congress legislated here in a field which the States have traditionally occupied. * * * So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. * * * Such a purpose may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make

---

17. It is also to be noted that FIFC is seemingly adversely affected in its own right, as well as in its representative capacity, as its revenues are derived from a percentage of each of its members' sales. While this is undoubtedly injury in fact, FIFC may not be within the zone of interests to be protected or regulated directly by section 125A, the MMPA or the Convention. Furthermore, FIFC is on a representative basis not apparently prosecutable under section 125A for any actions it might be expected to take in its normal course of business. Herein, however, this Court need not determine whether FIFC has standing in terms of its own interests since FIFC has standing itself for the reasons set forth hereinabove.

reasonable the inference that Congress left no room for the States to supplement it. \* \* \* Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. \* \* \* Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. \* \* \* Or the state policy may produce a result inconsistent with the objective of the federal statute. \* \* \* It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide. \* \* \*

More stringent standards apparently apply when foreign affairs, as opposed to purely domestic interests, are involved. In Hines v. Davidowitz, 312 U. S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the Supreme Court considered a preemption challenge to the Pennsylvania Alien Registration Statute, Pa.Stat.Ann. tit. 35, §§ 1801–1806 (Supp.1940). In that case, Mr. Justice Black wrote (at 62–63, at 402 of 61 S.Ct.):

> \* \* \* When the national government by treaty or statute has established rules and regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute, for Article VI of the Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the

Contrary notwithstanding." The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. "For local interests the several States of the Union exist; but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, *imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.* \* \* \* [Footnote omitted; emphasis supplied.]

Further (at 67–68, at 404 of 61 S.Ct.), Mr. Justice Black continued:

> \* \* \* This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. *Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.* And in that determination, it is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. *Any concurrent state power that may exist is restricted to the narrowest of limits; the state's power*

*here is not bottomed on the same broad base as is its power to tax.* \* \* \* [Footnotes omitted; emphasis added.]

### B. *The Convention.*

The Interim Convention on Conservation of North Pacific Fur Seals has as its stated purpose

> \* \* \* to take effective measures towards achieving the maximum sustainable productivity of the fur seal resources of the North Pacific Ocean so that the fur seal populations can be brought to and maintained at the levels which will provide the greatest harvest year after year, with due regard to their relation to the productivity of other living marine resources of the area,
>
> \* \* \* to conduct adequate scientific research on the said resources, and
>
> \* \* \* to provide for international cooperation in achieving these objectives \* \* \* .

Article II of the Convention requires the signatories to determine the necessary measures to maintain the fur seal populations at levels permitting the "greatest harvest year after year". Of course, " \* \* \* [t]o maintain the seal herd population at the maximum sustainable level of productivity, the elimination of surplus animals is required." Friends of Animals, Inc. v. Stans, Civil No. 1192–71, at p. 14 (D.D.C. July 8, 1971).[18] To establish the size of the animal commercial kill, Article V of the Convention created the North Pacific Fur Seal Commission.[19]

In its report on the Senate version of the MMPA, the Senate Commerce Committee stated: " \* \* \* [T]he fur seal population in the Pribilofs seems to be holding its own. Complete protection of the fur seal would require abrogation of the Fur Seal Convention, and a prob-

able return to pelagic sealing by the Japanese." S.Rep. No. 92–863, 92 Cong., 2d Sess. (1972). On the other hand, the Department of State in a letter to the Chairman of the House Committee on Merchant Marine and Fisheries, stated: " \* \* \* The Interim Convention on Conservation of North Pacific Fur Seals is not simply a device for compensating certain other countries for their action in refraining from taking fur seals on the high seas. A primary objective of the treaty is to bring the fur seal populations to and maintain them at 'the levels which will provide the greatest harvest year after year, with due regard to their relation to the productivity of other living marine resources of the area . . .' \* \* \*." 3 U.S.Code Cong. & Admin.News, 4183 (1972). In its report on the House version of the MMPA, the House Committee on Merchant Marine and Fisheries offered another explanation of the Convention's purpose:

> There was much testimony on the conduct of the Alaska fur seal program. Here the evidence is persuasive that, by and large, the program has operated to the advantage of the fur seal herd. As a result of uncontrolled killing by citizens of many nations in the last century, the world population of fur seals declined from several million to approximately 200,000 members. Accordingly, the United States, Japan, Great Britain (later Canada) and Russia developed a treaty in 1911 to regulate the taking of fur seals. As a result of this treaty, the herd has increased to a level of some 1.3 to 1.5 million, under what is generally considered to be a policy of enlightened and effective management. [*Id.* at 4149.]

Whatever the purpose of the Convention, the United States has made it a matter of foreign policy to enter the

---

18. A copy of that opinion has been placed in the official court file in this case.

19. In setting the size of the kill, the possible "detrimental effects [of fur seals] on other living marine resources substantially exploited by any of the Parties" to the Convention is to be considered. Convention, *supra*, Article II.

commercial seal fur business on a shared basis with three other nations with respect to North Pacific seals. A state statute prohibiting the commercial *taking* of these seals would certainly be preempted by the Convention. The Maryland statute, by prohibiting *importation* for commercial sale of seal furs and seal parts, also in part seemingly frustrates the commercial activity that the United States has authorized and engaged in. *Cf.* Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

### C. *The Fur Seal Act of 1966.*

The Congress enacted the Fur Seal Act of 1966, 16 U.S.C. § 1151 et seq., to implement the Convention. Section 1154 of that Act instructs the Secretary of the Interior as follows:

(a) The Secretary *shall* (1) take and cure fur seal skins on the Pribilof Islands and on lands subject to the jurisdiction of the United States whenever he deems such taking and curing is necessary to carry out the provisions of the Convention or to manage the fur seal herd, (2) employ natives of the Pribilof Islands and, when necessary, other persons for taking and curing of fur seal skins pursuant to this section, and compensate them at rates to be determined by the Secretary, (3) deliver to authorized agents of the parties such fur seal skins as the parties are entitled under the Convention, (4) *utilize such quantities of fur seal skins taken pursuant to this section or forfeited to, or seized by, the United States as the Secretary deems desirable for product development and market promotion,* (5) provide for the disposal or destruction of any fur seal skins that are damaged or that are determined by the Secretary to have no value or use as luxury furs, (6) provide for the processing of such quantities of fur seal skins as he deems desirable, (7) *provide from time to time for the sale, pursuant to such terms and conditions as the Secretary deems desirable, of fur seal skins and products of fur seals* not otherwise used or disposed of pursuant to this chapter, and (8) *deposit into the Pribilof Islands fund in the Treasury the proceeds from such sales,* except that the Secretary shall pay annually to the Commission the proceeds from the sales of any fur seal skins that are taken contrary to the provisions of this subchapter and the regulations issued thereunder or that are forfeited to the United States.

(b) *The Secretary is authorized to enter into agreements with any public or private agency or person for the purpose of carrying out the provisions of this subchapter, other than for the purpose of taking fur seals.* [Emphases added.] [20]

Section 1154 evinces congressional intent that seal furs taken subject to the Convention be actively marketed. Whether that determination is considered a domestic or foreign policy matter, the Maryland statute in and of itself runs counter to that policy and if emulated by a sufficient number of other states could frustrate congressional commands to the Secretary of the Interior. Accordingly, insofar as the Maryland statute applies to fur seals covered by the Convention and the Fur Seal Act, it is invalid. *Cf.* Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315, 324–325 (1974).

### D. *The Marine Mammal Protection Act.*

The MMPA was enacted pursuant to a congressional finding that certain stocks and species of marine mammals were "in danger of extinction or depletion" and should not be permitted

---

20. The processing contract between the United States and Fouke, set forth in part at pp. 1348–1349 n. 11, *supra*, was entered into pursuant to sections 1154(a)(4) and (b) of the Act.

The Fur Seal Act also permits sealing by Aleuts, Eskimos, and Indians. 16 U.S.C. § 1152.

further to diminish. 16 U.S.C. §§ 1361(1), (2). In drafting the MMPA, Congress considered total prohibitions on taking and importation of marine mammals. The House Committee on Merchant Marine and Fisheries, in reporting out the House version of the MMPA, stated:

> In adapting the bill to the circumstances involved in the present taking of marine mammals, the Committee gave careful consideration to alternative legislation urged upon it by dedicated and sincere individuals and groups *which would have provided a flat prohibition against the taking or importing of marine mammals,* with a few relatively minor exceptions. * * *
>
> While the basic premises underlying this legislation are certainly appealing, on close examination of the issue *the Committee simply found itself unable to accept the thesis that a flat ban would inevitably operate to the benefit of the animals concerned.* Experienced, independent scientists, not representing hunters, entrepreneurs or other interest groups, argued persuasively that animal populations may indeed require management in order to prevent them from exceeding the carrying capacity of their environment and thus destroying it and themselves in the process. "Nature's way" of regulating animal populations is very often less humane than man's way.
>
> The scientists made the point that man's thumb is already on the balance of nature and that to remove it altogether might be far more cruel and damaging than would be the effect of a responsible management program. Witnesses called to the attention of the Committee the situation in the British-held Farne Islands, where a strict "hands-off" policy has resulted in thousands of starving and disease-ridden seals. * * *

(Emphases added.) H.Rep. No. 92–707, 3 U.S.Code Cong. & Admin.News, p. 4152 (1972).

In explaining the permit system the Report states, "[w]hile clearly it is not to the benefit of an individual animal to be taken, *the Committee was persuaded by overwhelming scientific evidence that there are, in fact, cases in which animal species or stocks may be benefited by removing excess members. * * *" Id.* at p. 4157 (emphasis added).

The Conference Committee Report described the final version:

> The House bill included a five-year moratorium, with certain exceptions (scientific research, commercial fishing, Alaska fur seals and processing of skins). The Senate amendment provided for a permanent moratorium, except for scientific research and commercial fishing, and added a provision that allows the Secretary to waive the moratorium when such waiver would be compatible with the Act. The effect of the Senate amendment is to allow the Secretary to make a determination, species by species, that a waiver is appropriate; once that determination has been made, he would then be in a position to set general regulations on the taking of mammals, subject to the protective devices incorporated into both the House bill and the Senate amendment * * *.

Conf.Rep. 92–1488, 3 U.S.Code Cong. & Admin.News, p. 4187 (1972).

On that basis the Congress enacted a moratorium on taking and importation which the Secretary could modify through permits and regulations. Section 1371(a)(3)(A) of that Act provides:

> The Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, is authorized and directed, from time to time, having due regard to the distribution, abundance, breeding habits, and times and lines of migratory movements of such marine mammals, to determine when, to what extent, if at all, and by what means, it is compatible with this chapter to waive the requirements of this

section so as to allow taking, or *importing* of any marine mammal, or any marine mammal product, and to adopt suitable regulations, issue permits, and make determinations in accordance with sections 1372, 1373, 1374, and 1381 of this title permitting and governing such taking and *importing,* in accordance with such determinations: *Provided, however,* That the Secretary, in making such determinations, must be assured that the taking of such marine mammal is in accord with sound principles of resource protection and conservation as provided in the purposes and policies of this chapter: *Provided further, however,* That no marine mammal or no marine mammal product may be *imported* into the United States unless the Secretary certifies that the program for taking marine mammals in the country of origin is consistent with the provisions and policies of this chapter. Products of nations not so certified may not be *imported* into the United States for any purpose, including processing for exportation. [Emphases as to the words "importing" and "imported" have been added.]

Sections 1373 and 1374 empower the Secretary of the Interior to prescribe regulations and to issue permits with regard to taking and importing, and section 1373(f) requires him to report to the Congress with regard to the issuance of permits for taking and importation which "assure the well-being of such marine mammals."

What emerges from those provisions of the MMPA and their legislative history is that Congress intended not only to permit taking and importation when the same did not run counter to the preservation of marine mammal species and stocks, but also to permit such actions when it furthered efficient and effective herd management.

Perhaps the Congress could have achieved effective herd management solely through permits for taking, while imposing a flat ban on importation. It might be speculated, however, that the Congress decided instead to provide for importation permits so that other nations would be encouraged to adopt conservation programs for their marine mammals. Section 1378 of the MMPA requires the Secretary of the Interior through the Secretary of State to seek international agreements further to protect marine mammals. It may be, therefore, that the Congress decided to allow controlled importation so that the Secretary would have flexibility in negotiating such agreements. Whatever the reasons behind the congressional choice, state laws that impair the operation and objectives of the Act must give way.

■■■ In Florida Lime & Avocado Growers, Inc. v. Paul, *supra,* the Supreme Court considered a California statute which imposed higher standards for the marketing of avocados than those imposed by federal regulation. In upholding the statute in the face of a preemption challenge, the Court first noted that the type of subject matter is traditionally of peculiarly local concern, and is not one in which uniformity is crucial. It then ruled that since the Congress had evinced no intent that states be prohibited from imposing still higher standards, the state statute could stand. Similarly, in Palladio, Inc. v. Diamond, 321 F.Supp. 630 (S.D.N.Y.1970), aff'd per curiam, 440 F.2d 1319 (2d Cir.), cert. denied, 404 U.S. 983, 92 S.Ct. 446, 30 L. Ed.2d 367 (1971), Judge Mansfield, then a District Judge, upheld New York statutes prohibiting commercial importation of certain alligators, crocodiles, their bodies or skins, in the face of a preemption challenge based on the Endangered Species Conservation Act of 1969. That latter Act empowered the Secretary of the Interior to denote certain species as endangered and thus entitled to certain protections. Judge Mansfield concluded that the Congress did not intend that the State could not protect species in addition to those protected pursuant to the federal statute, and thus held that state protection of those additional species did not frustrate or conflict with the federal

Act. Such is not the case herein. The Congress has created a permit system for taking *and importation* in order to implement the protection of marine mammals after determining that a flat ban served that purpose less well. If the Maryland statute permitted broad scale importation of marine mammals, it would surely be invalid. Since Congress has determined that both prohibition of, and permission for, importation are tools for accomplishing the MMPA's purpose, the field occupied by the Maryland statute is also preempted by the MMPA. By imposing such an importation ban with respect to seals, the Maryland statute is inconsistent with the MMPA.[21]

Defendants assert that section 1379 of the MMPA evinces a congressional intent not to preempt state statutes banning importation of marine mammals, since that section is only directed to preemption of state statutes concerned with the *taking* of marine mammals within a state's jurisdiction. That section provides in relevant part:

(a)(1) Except as otherwise provided in this section, no State may adopt any law or regulation relating to the *taking* of marine mammals within its jurisdiction or attempt to enforce any State law or regulation relating to such taking.

(2) Any State may adopt and enforce any laws or regulations relating to the protection and *taking*, within its jurisdiction, of any species or population stock of marine mammals if the Secretary determines, after review thereof, that such laws and regulations will be consistent with (A) the regulations promulgated under section 1373 of this title with respect to such species or population stock, and (B) such other provisions of this chapter, and any rule or regulation promulgated pursuant to this subchapter, which apply with respect to such species or population stock. If the Secretary determines that any such State laws and regulations are so consistent, the provisions of this chapter, except this section and sections 1371 [of this title] (except to the extent that the Secretary waives the application of section 1371 [of this title] to permit such State laws and regulations to take effect) and 1380 of this title, and subchapter II of this chapter, shall not apply with respect to the species or population stock concerned within the jurisdiction of the State.

(3) Notwithstanding the preceding provisions of this subsection and the provisions of subsection (c) of this section, the Secretary shall continuously monitor and review the laws and regulations of any State which has assumed responsibility for marine mammals as provided for in paragraph (2) of this subsection. Whenever the Secretary finds that the laws and regulations of any such State are not in substantial compliance with either paragraph (1) or (2), or both, he shall resume responsibilities under this chapter for the marine mammals concerned within the jurisdiction of that State, superseding such State laws and regulations to the extent which, after notice and opportunity for hearing, he deems necessary. [Emphases added.]

In reporting the bill to the floor of the House, the House Committee on

---

21. As noted *supra* at p. 1349, defendants assert that Maryland is not a significant market for importation of sealskins and seal parts. This Court rejects the contention that the first two, four or fifteen states may validly enact statutes such as the Maryland statute on the grounds of minimal impact, but that the preemption doctrine would bar any more states from passing such a statute. It is to be noted that in City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the impact of the challenged ordinance on federal regulations was minimal. The majority of the Court, however, took into account (at 639 at 1862 of 93 S.Ct.) in a 5–4 decision the impact of the ordinance "[i]f we were to uphold [it] . . . and a significant number of municipalities followed suit * * *."

Merchant Marine and Fisheries stated with regard to what became section 1379:

> \* \* \* This subsection preempts state laws and regulations relating to the *taking* of marine mammals, except as provided in subsection (b).
>
> (b) This subsection authorizes the Secretary to develop effective working cooperative arrangements with state agencies and officials in order to carry out the purposes of this Act. It is not the intention of this Committee to foreclose effective state programs and protective measures such as sanctuaries; it is rather our intention to allow the development of a unified integrated system of management for the benefit of the animals and to encourage the states to take all actions which are consistent with this objective.

3 U.S.Code Cong. & Admin.News, p. 4161 (1972) (emphasis added). And the Conference Committee Report stated:

> The House bill preempted State law, but allowed cooperative agreements with the States in harmony with the purposes of the Act. The Senate amendment allowed the Secretary to review State laws and to accept those that are consistent with the policy and purpose of the Act. The conference substitute clarifies the Senate version to assure that the Secretary's determination will control as to whether or not the State laws are in compliance. Once granted authority to implement its laws relating to marine mammals, the State concerned may issue permits, handle enforcement, and engage in research. [*Id.* at 4190.]

 Thus, it appears that section 1379 was indeed, as defendants urge, facially directed toward *taking within* states and to cooperation in connection therewith by federal and state authorities subject to federal control, and that section 1379 itself was not directed toward importation and did not itself evince a congressional intent to preempt state laws with respect to *importation.* Yet it is also clear that the absence of a specific congressional intent, insofar as section 1379 is concerned, to preempt state law does not alter the fact that, for reasons discussed at pp. 1356–1359, *supra,* importation was, by the very nature of the enactment of the MMPA, necessarily preempted for federal control. Additionally, this Court notes that no information has been presented in this case to establish that the Secretary of the Interior, subsequent to the enactment of the MMPA, has indicated that he has approved the challenged Maryland statute or any state statute similar to it or even that the Secretary considers that he has the power so to do.

## IV. *Conclusion.*

Because the Maryland Act frustrates the operation of and conflicts with a treaty and two federal laws, this Court, pursuant to the Supremacy Clause, hereby declares 6 Md.Ann.Code art. 66C, § 125A unconstitutional. Accordingly, the motions for summary judgment of plaintiffs are hereby granted, the motions for summary judgment of defendants are hereby denied, and judgment for plaintiffs is hereby entered. Defendants are to pay the costs.