COMMITTEE FOR HUMANE LEGISLA-
TION, INC., Plaintiff,

v.

Elliot L. RICHARDSON et al.,
Defendants.

FUND FOR ANIMALS et al., Plaintiffs,

v.

Elliot L. RICHARDSON et al.,
Defendants.

Civ. A. No. 74–1465.

United States District Court,
District of Columbia.

May 11, 1976.

Bernard Fensterwald, Washington, D. C., for plaintiff Committee for Humane Legislation, Inc.

William A. Butler, John F. Hellegers, Richard E. Gutting, Jr., Washington, D. C.,

for plaintiffs Fund for Animals et al., and for plaintiff-intervenor Environmental Defense Fund; Leslie A. Blau, Michael L. Burak, New York City, of counsel.

Nicholas S. Nadzo, Atty., Dept. of Justice, Washington, D. C., for defendants, Elliot L. Richardson, Secretary, Dept. of Commerce, et al., Arthur R. Watson, Atty., National Oceanic and Atmospheric Administration, Washington, D. C., of counsel.

William H. Allen, John A. Hodges, Washington, D. C., for defendants-intervenors, American Tunaboat Association and Tuna Research Foundation.

David Jaffe, New York City, Patrick O'Donoghue, Washington, D. C., for defendants-intervenors, Fishermen's Union of America, Pacific and Caribbean Area Local 33, Fishermen and Allied Workers' Union, I. L. W. U., and United Cannery and Industrial Workers of the Pacific.

Ronald A. Zumbrun, Raymond M. Momboisse, Sacramento, Cal., John H. Midlen, Washington, D. C., Glenn E. Davis, Sacramento, Cal., for amicus curiae Pacific Legal Foundation.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

These consolidated actions are before the Court on cross motions for summary judgment. At issue in this case are the statutory limitations on the authority of the Secretary of Commerce to adopt regulations, pursuant to the Marine Mammal Protection Act of 1972 (MMPA), Pub.L. 92–522, 86 Stat. 1027 et seq., 16 U.S.C. § 1361 et seq.

(1974 Supp.), that provide for the issuance of permits for the "taking"[1] of porpoise incidental to commercial fishing activities. The provisions of the MMPA which are relevant to this suit raise important questions of first impression.[2] Jurisdiction is provided by 5 U.S.C. § 702 (Administrative Procedure Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1362 (mandamus).

Plaintiffs and plaintiff-intervenors, fourteen organizations whose common purpose is to protect and enhance the natural environment, assert that defendants have breached their duty under the MMPA to protect porpoise from commercial exploitation and request that the Court grant various types of injunctive relief until such time as defendants have fully complied with the requirements of the MMPA.[3]

The defendants in this case are the Secretary of Commerce, the Administrator of the National Oceanic and Atmospheric Administration (NOAA), and the Director of the National Marine Fisheries Service (NMFS). Pursuant to lawful delegations by the Secretary and the Administrator of NOAA, the Director of NMFS is currently responsible for carrying out the functions prescribed by the MMPA. Five organizations representing key elements of the United States tuna industry have been permitted to intervene as defendants. One of these defendant-intervenors, the American Tunaboat Association (ATA), is the recipient of a general permit issued by defendant NMFS which authorizes the "taking" of porpoise incidental to the course of commercial fishing op-

---

1. "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

2. In Fouke Co. v. Mandel, 386 F.Supp. 1341 (D.Md.1974), Judge Kaufman considered the provisions of the MMPA relating to the importation of marine mammals in deciding that a Maryland state statute on that subject was preempted by federal law. No other reported case has construed the MMPA.

3. Relief is also sought under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq., for defendants' failure to promulgate an adequate environmental impact statement. In the early stages of this case, it was envisioned that the Court's first task would be to review the impact statement. However, subsequent events, including the promulgation of a new impact statement, have led the parties to concentrate on the issues raised under the MMPA. At oral argument, counsel on both sides devoted almost all of their time to the MMPA issues which are central to this case. In light of this development, and also in light of the decision on the MMPA issues reached herein, the Court finds it unnecessary to decide the NEPA claims.

erations. Contrary to plaintiffs' allegations, defendants uniformly assert that NMFS has carried out the purposes of the MMPA in an entirely responsible manner and that the agency has been diligent to develop and require the use of fishing gear and techniques designed to reduce porpoise mortality rates.

After careful consideration of the voluminous record compiled in this case, as well as the able arguments of counsel, the Court has concluded that, there being no material facts in dispute, plaintiffs' motions for summary judgment should be granted, for the reasons set forth below.

## I. BACKGROUND

The origin of this dispute is the recent development of a highly efficient and economical mode of fishing for yellowfin tuna. Prior to 1960, yellowfin tuna were caught primarily by fishing with poles and live bait. During the period from 1957 to 1961, a more efficient means of catching tuna was developed, utilizing the commonly-known fact that yellowfin tuna in the eastern tropical Pacific frequently associate with certain species of dolphins (ordinarily called porpoise). Since porpoise are larger and more active on the ocean's surface than tuna, yellowfin tuna can be found by searching for porpoise. In this process of fishing "on porpoise," speedboats herd groups of porpoise into large purse seine nets. The yellowfin tuna swim beneath the porpoise, and both are trapped when the net is closed or "pursed" around them. Although most of the porpoise escape by swimming through an opening provided in the top of the net, some instead dive to the bottom of the net where their snouts become caught in the webbing; unable to

surface, these air-breathing mammals then suffocate. Others apparently drown as a result of shock, physical injury, or the refusal to abandon other porpoise that are entangled in the net.

Since the early 1960's, purse-seine fishing for tuna has burgeoned. According to NMFS, between one-third and one-half of the domestic tuna catch is taken in association with porpoise.[4] With this increase in purse-seine fishing, the number of porpoise killed as a consequence has also increased. It is estimated that incidental porpoise mortalities during the two years preceding the enactment of the MMPA totaled more than 600,000.[5]

### A. The Marine Mammal Protection Act of 1972.

In response to the massive, albeit unwanted, killing of porpoise and other marine mammals incident to commercial enterprise, Congress found, in passing the MMPA, that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities. . . ." 16 U.S.C. § 1361(1). In drafting the MMPA, Congress considered essentially two alternative approaches to averting this danger.[6] The first was a total prohibition against the taking or importation of marine mammals. The second approach was a scientific management program with flexibility to ensure the protection of each species in light of specific environmental factors affecting that species. The flat ban proposal was rejected, not on principle, but because it was considered inflexible, unrealistic, and unlikely to benefit the animals concerned.[7] Instead, Congress adopted a compromise between the two approaches. The MMPA

4. NMFS, Southwest Fisheries Center, "Progress of Research on Mortality Incidental to Tuna Purse-Seine Fishing for Fiscal Year 1975" (SWFC Report), at 3 (August 8, 1975). This statistic covers all species of tuna and all ocean areas in which U. S. fishermen catch tuna.

5. The individual estimates for total incidental porpoise mortality in 1971 and 1972 appeared in a notice of proposed regulations which de-

fendant NMFS published on September 8, 1975 (40 Fed.Reg. 41535).

6. See 117 Cong.Rec. 44951–60 (1971) (House floor debates on H.R. 10420).

7. In reporting out the House version of the MMPA, the House Committee on Merchant Marine and Fisheries (House Committee) stated:

establishes a moratorium on the taking and importation of marine mammals, but the moratorium can be modified by regulations and permits that are consistent with the goal of protecting marine mammals. 16 U.S.C. § 1371.

In addition, a special exception to the moratorium was created for commercial fishermen: during the two-year period immediately following October 21, 1972, the effective date of the Act, the taking of marine mammals incidental to commercial fishing operations was permitted, subject to certain interim regulations requiring the

use of fishing techniques which produced "the least practicable hazard to marine mammals . . . ." 16 U.S.C. § 1371(a)(2). The legislative history of the MMPA indicates that Congress granted this special exemption after being assured by representatives of the tuna industry that they had found a solution, through fishing gear modifications, to the porpoise mortality problem.[8] Two years were thus provided for the refinement of these fishing gear modifications and for their deployment to the tuna fleet.[9] Section 1381(a) of the MMPA reflects this congressional intent

"In adapting the bill to the circumstances involved in the present taking of marine mammals, the Committee gave careful consideration to alternative legislation urged upon it by dedicated and sincere individuals and groups which would have provided a flat prohibition against the taking or importing of marine mammals, with a few relatively minor exceptions. . . .

"*While the basic premises underlying this legislation are certainly appealing, on close examination of the issue the Committee simply found itself unable to accept the thesis that a flat ban would inevitably operate to the benefit of the animals concerned.* Experienced, independent scientists, not representing hunters, entrepreneurs or other interest groups, argued persuasively that animal populations may indeed require management in order to prevent them from *exceeding* the carrying capacity of their environment and thus destroying it and themselves in the process. 'Nature's way' of regulating animal populations is very often less humane than man's way." H.R.Rep.No.92–707, 92d Cong., 1st Sess. 19 (1971), U.S.Code Cong. & Admin. News 1972, p. 4152 (emphasis added). See also, 118 Cong.Rec. 7686 (1972) (remarks of Rep. Dingell, Chairman of the House Subcommittee on Fisheries and Wildlife Conservation [House Subcommittee]); S.Rep.No.92–863, 92d Cong., 2d Sess. 5 (1972).

8. Testifying before the House Subcommittee, Captain Joe Medina reported the results of a test comparing his cousin's use of a new "Medina panel" with his own use of the old type of net:

" . . . [W]e both made sets on schools of porpoise and tuna at the same time. He was through an hour before we were.

"Out of 1,500 porpoises, Harold only had four porpoises left in the net after backing down and these were removed by hand.

"We, working a set on another school, finished backing down and we had 50 or 60 porpoise that got tangled . . .

"As late as this last Wednesday . . . my cousin . . . set on a school of 2,000 porpoise and after backing down, he had four porpoise left and those where taken out alive.

" . . .

" . . . I feel in a year the whole fleet will convert over and everybody will have the new net. . . .

"I also talked to my vessel this past Wednesday. They have the webbing on this trip and they say it is like the difference between day and night. It has been a real help.

"*We have the problem licked.*"

Hearings on H.R. 10420 et al. Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries (House Hearings) 92d Cong., 1st Sess. part 1, at 348 (1971) (emphasis added). The "backing down" operation referred to in Medina's testimony is a procedure which is designed to enable porpoise to escape from the net.

9. Dr. Kenneth Norris, then chief scientist of the Marine Mammal Division of the Oceanic Institute in Hawaii, now a member of the Marine Mammal Commission, testified before the House Subcommittee that the " . . . development of change in the net may well be the solution to the problem, but I think it needs much more investigation." (House Hearings, *supra,* note 8, at 406). Subsequently, Congressman Pelly, co-sponsor of H.R. 10420, proposed a temporary moratorium " . . . to give the tuna fisheries association an opportunity to develop *what they indicate is certainly a solution.*" House hearings, *supra,* at 407 (emphasis added). Thus, the House Committee Report states:

"More recently, new techniques have been developed involving smaller mesh nets, and the industry is hopeful that the excessive kills of the past will now be stopped. The Committee took pains in its consideration of this bill to see that the legitimate needs of the tuna industry were not ignored, *while accepting the clear requirement that porpoises be*

and directs the defendants during this two-year period:

"... to immediately undertake a program of research and development for the purpose of devising improved fishing methods and gear so as to reduce to the maximum extent practicable the incidental taking of marine mammals in connection with commercial fishing."

Section 1371(a)(2) of the Act provides that, after the expiration of this temporary grace period, any taking of marine mammals by commercial fishermen must be under a permit issued pursuant to section 1374, and subject to regulations prescribed under section 1373.[10] Additionally, section 1371(a)(3)(A) provides that in determining whether to waive the moratorium on the taking of marine mammals after October 20, 1974, the defendants:

"... *must be assured* that the taking of such marine mammal is in accordance with sound principles of resource protection and conservation as provided in the purposes and policies of this chapter...." (Emphasis added).

The guiding principles of resource protection and conservation referred to in § 1371(a)(3)(A) are set forth in §§ 1361(2) and (6) of the Act as follows:

"(2) such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, *consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population.* ...[11]

"(6) ... it is the sense of the Congress that [marine mammals] should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that *the primary objective of their management should be to maintain the health and stability of the marine ecosystem....*" (Emphasis added).

As noted above, section 1373 of the MMPA governs the promulgation of regulations relating to the taking of marine mammals. This section directs the agency, prior to issuing any permits,[12] to prescribe regulations with respect to the taking and importing of animals from each species of marine mammal as they deem "necessary and appropriate to *insure that such taking will not be to the disadvantage* of those species and population stocks and will be consistent with the purposes and policies set forth in section 1361 of this title." (Emphasis added). Furthermore, in prescribing these regulations, defendants must comply with certain procedural requirements set forth in section 1373(d) of the Act, as follows:

"Regulations prescribed to carry out this section with respect to any species or

---

given every reasonable protection." H.R. Rep.No.92–707, *supra* note 7, at 15–16, U.S. Code Cong. & Admin.News 1972, p. 4148 (emphasis added).

10. 16 U.S.C. § 1371(a)(2) states:

"... Subsequent to such twenty-four months, marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued thereof pursuant to section 1374 of this title, subject to regulations prescribed by the Secretary in accordance with section 1373 of this title. *In any event, it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate.*" (Emphasis added).

11. "The term 'optimum sustainable population' means, with respect to any population stock, the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the optimum carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." 16 U.S.C. § 1362(9).

"The term 'optimum carrying capacity' means the ability of a given habitat to support the optimum sustainable population of a species or population stock in a healthy state without diminishing the ability of the habitat to continue that function." 16 U.S.C. § 1362(8).

12. 16 U.S.C. § 1374(b)(1) requires that any permit issued "be consistent with any applicable regulation established by the Secretary under section 1373 of this title...." See also note 13, *infra.*

stock of marine mammals must be made on the record after opportunity for an agency hearing *on both the Secretary's determination to waive the moratorium pursuant to section 1371(a)(3)(A) of this title and on such regulations,* except that, in addition to any other requirements imposed by law with respect to agency rulemaking, the Secretary shall publish and make available to the public either before or concurrent with the publication of notice in the Federal Register of his intention to prescribe regulations under this section—

> (1) *a statement of the estimated existing levels* of the species and population stocks of the marine mammals concerned;
>
> (2) *a statement of the expected impact of the proposed regulation on the optimum sustainable population* of such species or population stock;
>
> (3) a statement describing the evidence before the Secretary upon which he proposes to base such regulations; and
>
> (4) any studies made by or for the Secretary or any recommendations made by or for the Secretary of the Marine Mammal Commission which relate to the establishment of such regulations."

(Emphasis added).

Only after regulations are properly prescribed under section 1373 of the MMPA are defendants authorized to issue permits under section 1374 of the Act.[13] In section 1374, Congress provided still further safeguards for the protection and conservation of marine mammals. Initially, § 1374(d)(3) imposes a strict burden of proof on each applicant seeking to take or import marine mammals:

> "The applicant for any permit under this section must demonstrate to the Secretary that the taking or importation of any marine mammal under such permit will be consistent with the purposes of this chapter and the applicable regulations established under section 1373 of this title." [14]

Assuming this burden is met, § 1374(b)(2)(A) then requires that any permit issued under this section specify, *inter alia,* "the number and kind of animals which are authorized to be taken or imported." [15]

## B. *Action at the Agency Level.*

On March 13, 1974, approximately seven months prior to the expiration of the two-year grace period discussed above, defendant NMFS published a notice of intent to prescribe regulations pursuant to §§ 1371(a)(2) and 1373 of the MMPA with respect to the incidental taking of marine mammals by commercial tuna fishermen. The existing population levels of the marine mammals concerned were described in this notice as "unknown" and the expected impact of the proposed regulations on the optimum sustainable population of each species was reported as "not known due to lack of knowledge of the sizes of porpoise populations and other population dynamic factors. . . ." 39 Fed.Reg. 9685 (1974).

---

**13.** Congressman Dingell, Chairman of the House Subcommittee, and Congressman Pelly both emphasized, in reporting out the House version of the MMPA, the critical importance of the substantive and procedural requirements of section 1373 in providing a check on the Secretary's discretion to authorize the taking of marine mammals. See 118 Cong.Rec. 7686–87 (1972) (floor debates).

**14.** Explaining the effect of this requirement, the House Report states:

> "In every case, the burden is placed upon those seeking permits to show that the taking should be allowed and will not work to the disadvantage of the species or stock of animals involved. *If that burden is not carried—and it is by no means a light burden—the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out with the interests of the animals as the prime consideration.*" H.R. Rep.No.92–707, *supra* note 7, at 18, U.S.Code Cong. & Admin.News 1972, p. 4151 (emphasis added).

**15.** Subsequent to the enactment of the MMPA, defendant NMFS adopted procedural rules under which individual commercial fishermen could apply for and receive "certificates of inclusion" within a general industry-wide permit issued pursuant to § 1374. 50 C.F.R. § 216.-24(b)(4).

On April 5, 1974, the agency published proposed regulations in the Federal Register, 39 Fed.Reg. 12356 (1974), and a hearing on the regulations was held on May 15–16, 1974. Plaintiffs participated in this hearing and opposed the proposed regulations on the grounds that defendants had not complied with the requirements of the MMPA. On July 15, 1974, an administrative law judge issued a recommended opinion in which he concluded that the proposed regulations providing for the issuance of permits should, with certain modifications, be adopted.

On September 5, 1974, defendants published the initial version of the final regulations, 39 Fed.Reg. 32117 (1974), providing for the issuance of general permits to classes of fishermen using one of five categories of fishing gear. The regulations that governed the tuna purse-seining permits and certificates of inclusion required the use of various gear and fishing techniques designed to reduce incidental porpoise mortality. 50 C.F.R. § 216.24(d)(2). On September 8, 1974, the agency published a notice that the ATA had applied for a general permit to take marine mammals pursuant to the regulations published on September 5, 1974. 39 Fed.Reg. 33813 (1974). Plaintiff Environmental Defense Fund opposed this application in a letter to defendants dated October 10, 1974. Thereafter, the ATA was granted a general permit under which certificate of inclusion holders were allowed to take, subject to restrictions which might be imposed as a result of future hearings, an unlimited number of marine mammals during the period from October 21, 1974, to December 31, 1975.

Responding in part to preliminary findings by the Southwest Fisheries Center that the population of spotted porpoise was dangerously low, the agency held further public hearings on December 10–11, 1974. Dr. Kenneth Norris, testifying at the hearings on behalf of the Marine Mammal Commission,[16] stated:

> "It is our conclusion that *even the most conservative estimate* of porpoise mortality in the Eastern Tropical Pacific Tuna Fishery . . . *represents an unacceptably high level of mortality*, both in terms of the specific charge of the Marine Mammal Protection Act to reduce the rate of such mortality and serious injury to insignificant levels approaching zero and in terms of the overall protection and conservation policy objectives of the Act to maintain the health and stability of the marine ecosystem." Hearing Transcript, p. 67 (emphasis added).

As a result of these hearings, defendants published a notice in the Federal Register that certain changes in fishing techniques would be required in the tuna industry's permit, 40 Fed.Reg. 764 (1975); and that it was the agency's goal to reduce the porpoise mortality rate by fifty per cent for 1975. *Id.* at 765. Subsequently, however, the SWFC Report, dated August 8, 1975, stated that the 1975 total observable porpoise kill in the eastern Pacific Ocean "will probably fall within the range of 93,000 to 214,000 animals" and that it appeared that "the estimated total mortality of porpoises will probably increase in 1975 over the level estimated for 1974." (SWFC Report at 34.)

---

**16.** It was Congress' intention that the Marine Mammal Commission should play a significant advisory role in the protection of marine mammals. House Subcommittee Chairman Dingell remarked on the floor of the House that:

> "Still further safeguards are built into title II of the bill, which authorizes the establishment of an independent Marine Mammal Commission, charged with responsibility for reviewing the entire program, and for considering and recommending ways in which that program may be improved. The commission is given further powers, which I have never seen in any other legislation enacted by Congress: Recommendations which it makes to Federal agencies must be considered carefully by them, and recommendations which are not followed must be returned to the commission with a detailed explanation of the reasons that they were not followed." 118 Cong.Rec. 7686 (1972).

Subchapter II of the MMPA as ultimately enacted includes these same safeguards. Additionally, section 1373(a) requires that regulations thereunder be prescribed "in consultation with the Marine Mammal Commission."

On August 6, 1975, the ATA applied for a renewal of its general permit for 1976. In this application, ATA stated that "[a]pproximately 85,060 dolphin mortalities are projected and an unknown number will be injured." (October 1975 Hearing Exhibit No. 1, at 3.) On September 8, 1975, the agency announced proposed regulations for the 1976 fishing season and indicated therein its intention to establish a quota for 1976 somewhere in the range of 50,000 to 110,000 animals "on a basis that the allowable kill will, *with reasonable assurance, enable the principal stocks of porpoises to increase in size.*" 40 Fed.Reg. 41531 (1975) (emphasis added). In this same notice, estimates were given for existing population levels of the two species of porpoise principally involved in tuna purse seining,[17] and it was noted that, with respect to all species, "[o]ptimum sustainable population levels have not been determined; therefore, no statement can be made as to the effect of the proposed action on optimum sustainable populations." 40 Fed.Reg. 41536 (1975). After then estimating the annual incidental mortality rate for these same two species, the notice went on to state:

"At these levels of incidental fishing mortality, the *present* population stocks are either stable or increasing or decreasing slightly. There is no evidence that the porpoise populations would substantially increase or decrease as a result of the regulations and reissuance of the general permit." *Id.* (emphasis added).

On October 9–10 and 24–25, 1975, the agency held public hearings on its proposal to set a quota on porpoise mortality for 1976.[18] In a letter to the Director of NMFS dated November 6, 1975, the Marine Mammal Commission, through its General Counsel, stated:

". . . [T]he Commission finds no basis for confidence that *any number above zero* would provide the basis for 'assurance' that the principal stocks of porpoise will increase in size. An intensive research program is necessary to assess and monitor population status and trends. Recent discussions indicate that adequate resources and commitments may be forthcoming. In the interim, the Commission feels that the applicant [ATA] should be permitted to take the requested number [85,060] subject to intensive and continuing review of existing and new data concerning population parameters. . . ." Letter from Robert Eisenbud to Robert Schoning at 5 (emphasis added).

On December 5, 1975, the agency announced in the Federal Register that it would not, initially, impose a quota for 1976 as originally proposed, 40 Fed.Reg. 56899 (1975), but that it would do so "in May or thereafter if the total number of porpoise deaths for the year is projected to exceed 70 per cent of the final estimated 1975 kill."[19] *Id.* at 56900. The agency stated that it believed that its approach:

". . . represents, at this time, the most reasonable way that it can meet its responsibility to reduce porpoise mortality incidental to yellowfin tuna fishing and its responsibility not to shut down or significantly curtail the activities of the tuna fleet as set forth in the Marine Mammal Protection Act and its legislative history." 40 Fed.Reg. 56899 (1975).

On December 19, 1975, defendant NMFS issued to ATA a general permit allowing the incidental taking of marine mammals subject only to certain restrictions on fishing techniques and gear as were set forth in

17. Approximately 82 per cent of the total 1974 porpoise kill involved the offshore spotted dolphin, *Stenella attenuata*, and the eastern spinner dolphin, *Stenella longirostris*. 40 Fed.Reg. 41535–36 (1975).

18. At these hearings, plaintiffs supported the imposition of a quota for the 1976 season while defendant-intervenors took the position that a quota would be contrary to the intent of the

MMPA, economically disastrous to the tuna industry, and counterproductive to the goal of reducing porpoise mortality.

19. In this same notice, the 1975 incidental mortality figure was estimated to be 130,000. This marked an increase over the 1974 figure which, according to the agency's notice of September 8, 1975, was 97,800. 40 Fed.Reg. 41535 (1975).

the agency's December 5 regulations.[20] 40 Fed.Reg. 56899 (1975).

## II. ISSUES

A. *The Primary Purpose of the MMPA is to Protect Marine Mammals; the Act was not Intended as a "Balancing Act" Between the Interests of the Fishing Industry and the Animals.*

Plaintiffs allege, and the Court agrees, that the defendants have failed to meet specific requirements of the MMPA with respect to the issuance of regulations and permits providing for the incidental taking of marine mammals. Before turning to a consideration of those violations, however, the Court will consider a more basic issue in contention: the intended general purpose of the Act.

Plaintiffs assert that the primary purpose of the MMPA is to protect marine mammals and that other interests, such as those of the tuna industry, should be served only if they are compatible with this primary goal. On the other hand, defendants take the position that the legislative history of the MMPA indicates Congress' "dual con-cern" for the well-being of the porpoise and of the tuna industry, and that this dual concern was intended to be expressed in action taken at the agency level.[21]

■ The Court finds plaintiffs' position more persuasive. The language of the Act itself, as discussed in part I–A, *supra,* clearly indicates that Congress enacted the MMPA for one basic purpose: to provide marine mammals, especially porpoise, with necessary and extensive protection against man's activities. The Congressional declaration of policy set forth in section 1361(6) is representative of the Act's paramount concern for marine mammals:

> "[M]arine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of Congress that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. . . ."[22]

---

**20.** In response to the agency's decision not to impose a quota at the beginning of the 1976 season and to a subsequent explanation of that decision in a letter from Robert Schoning, Director of the NMFS, the Executive Director of the Marine Mammal Commission, John Twiss, wrote the following in a letter to Mr. Schoning dated March 8, 1976:

" . . . The Commission recommended the 85,060 figure because it was a reduction in the kill over the last two years by the U.S. fleet and because of the logic which you noted in your letter to me. That is the figure, after all, which the industry requested and the Commission felt that it would be inappropriate to grant permission to kill any more than the requested number *in light of the grave uncertainties of the situation.* You suggest that you 'simply had to develop a more substantive basis for our action than an estimate provided by industry' and that you 'believe we have developed a better one.' *I know of nothing contained in the documentation relating to this matter which suggests that a 30% reduction in last year's kill will more effectively assure that the principal populations will increase. As I noted above, it appears that a 30% reduction will still leave 93,450 porpoises dead at the end of the season.* If this is true, then your approach to this problem will sanction the killing of more porpoises than would be killed had the Commission's recommendation been adopted. . . ." Letter from John Twiss to Robert Schoning at 2–3 (emphasis added).

**21.** For example, defendant-intervenors maintain in their brief in support of their cross-motion for summary judgment that " . . . [t]he mandate of Congress is that the [federal agency] should try to reduce porpoise mortality rates but in a way that will maintain a healthy United States tuna industry. . . ." Brief for defendant-intervenors at 2. It is clear that the agency's conduct was in fact based on this understanding of what the Act was intended to do. Jack Gehringer, Deputy Director of NMFS, stated at the October 1975 hearings that:

" . . . even though the number [of porpoise] killed in 1975 will be higher than anticipated, there is no indication that the populations are being depleted. We must be realistic if we establish a ceiling for 1976, recognizing our obligation to both the porpoise and the industry." Hearing, October 9, 1975 (Morning Session), Supplemental Administrative Record, Attachment No. 7 at 56.

**22.** See the discussion of this section of the Act in Part I–A, *supra.*

An overwhelming number of additional statutory provisions, discussed in part I–A, *supra,* reflect the Act's foremost aim to protect marine mammals.[23]

The legislative history also contains numerous references to the Act's primary objective. For example, Representative Garmatz, Chairman of the full House Committee which considered H.R. 10420, stated on the House floor that "[t]his legislation is designed to do exactly what its title implies—provide badly needed protection to marine mammals." 118 Cong.Rec. 7685 (1972). Similar sentiments were expressed by Representative Dingell, Chairman of the House Subcommittee which conducted hearings on H.R. 10420:

". . . I am aware that there are representatives of animal protection groups that object to this bill, and I am also aware that there are representatives of organizations which make use of marine mammals who are also unhappy with the bill in its present form. I would say to them, as the committee has said, that this bill [H.R. 10420] provides *that level of protection and responsibility which is most in line, not with the interests of these groups, but with the interests of the animals themselves.*" 117 Cong.Rec. 44951 (1971) (floor debates) (emphasis added).[24]

It would be possible to elaborate even further on the overwhelming evidence in the statute and the legislative history as to the purpose of the Act. However, in light of the fact that the Court has already discussed the statutory scheme in detail in part I–A, *supra,* the Court turns instead to a consideration of the evidence marshalled by defendants in support of their position that the MMPA mandates a "balancing act" between the interests of the mammals and those of the tuna industry.

Defendants rely primarily on three statements in the legislative history. This Court finds that none of those statements are persuasive in light of the numerous indications to the contrary discussed above.

■ For example, defendants rely on floor remarks of Representative Goodling, a member of the joint conference committee which considered the MMPA, to the effect that "there must be an appropriate balancing of equities between the two extremes of a zero mortality rate and elimination of a commercial fishing industry." 118 Cong. Rec. 34643 (1972). But it is clear from a consideration of the entirety of his remarks that they were made in the context of a discussion of the declaration in 16 U.S.C. § 1371(a)(2) that " . . . it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals . . . be reduced to insignificant levels approaching a zero mortality and serious injury rate." (See note 10, *supra.*) Representative Goodling's remarks were intended as his interpretation of the general "zero mortality" policy goal expressed in

---

**23.** See, *e. g.,* 16 U.S.C. §§ 1361(6), 1371(a)(3)(A), 1373(a), 1374(d)(3), and 1402(a)(3).

**24.** Of course, indications from the committee reports are even more persuasive evidence, since they represent "the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345, 356 (1969). In this case, the committee reports are consistent with the remarks of individual members cited above. For example, in explaining the policy declaration in § 1361(6), the House Committee Report states:

"This subsection states that marine mammals are resources of great significance and that it is congressional policy that they should be protected and encouraged to devel-

op consistent with sound policies of resource management. The primary objective of this management must be to maintain the health *and stability of the marine ecosystem;* this in turn indicates that *the animals must be managed for their benefit and not for the benefit of commercial exploitation.*" H.R.Rep.No. 92–707, *supra* note 7, at 22, U.S. Code Cong. & Admin.News 1972, p. 4154 (emphasis added).

To the same effect, the Senate Report from the Committee on Commerce declares that:

"The purpose of this bill [S.R. 2871] is to conserve and protect marine mammals by regulating activities of U.S. citizens and activities of all persons carried on within the jurisdiction of the United States." S.Rep.No. 92–863, *supra* note 7, at 1.

section 1371(a)(2); they did *not* constitute a suggestion that any "balancing of equities" should affect the agency's compliance with the more specific directives of the Act,[25] *e. g.,* 16 U.S.C. §§ 1373 and 1374. In any case, even assuming *arguendo* that a broad reading of Mr. Goodling's comments is justified, they are entitled to little probative value in light of the plain meaning of the MMPA. Not even formal reports, much less the statements of individual committee members, can be resorted to for the purpose of construing a statute contrary to its plain terms. *Pennsylvania Railroad Co. v. International Coal Mining Co.,* 230 U.S. 184, 199, 33 S.Ct. 893, 896, 57 L.Ed. 1446, 1452 (1913); *FTC v. Manager, Retail Credit Co.,* 169 U.S.App.D.C. 271, 278, 515 F.2d 988, 995 n.14 (1975); *see* 2A *Sutherland Statutory Construction* ¶ 48.14, at 220 (4th ed. 1973).

■ Defendants also rely on language in the Senate Committee Report to establish the proposition that NMFS can authorize the incidental taking of marine mammals if it is satisfied that the tuna industry is employing the best feasible technology to prevent harm to marine mammals:

"This subsection [16 U.S.C. § 1373(b)] lists the general criteria which may be considered by the Secretary in the process of prescribing regulations under the Act. These include a wide range of factors such as the effect of limitations on present and future animal populations, U.S. treaty requirements, ecological and environmental considerations, the conservation and development of fishery resources and economic and technological feasibility.

"The Secretary, for example, in regulating the operations of the tuna industry with respect to the incidental catching of porpoises must consider the technical capability of these fishermen to avoid injury to porpoises. It is not the intention of the Committee to shut down or significantly to curtail the activities of the tuna fleet so long as the Secretary is satisfied that the tuna fishermen are using economically and technologically practicable measures to assure minimal hazards to marine mammal populations." S.Rep.No. 92–863, *supra* note 7, at 16.[26]

This excerpt is, admittedly, the strongest evidence in support of defendants' view of the Act. But the Court cannot rely on this isolated statement to conclude that the MMPA merely establishes a "best feasible technology" standard. First, the weight of the legislative history is to the contrary, as noted above. More importantly, the entire MMPA, including the section explained in the excerpt above, rejects a "means oriented" approach. That is, the Act is not primarily a directive as to *how* marine mammals may be taken; rather, it is result-oriented: it directs that an estimated impact of any proposed taking be made and provides that such taking may not be authorized if the impact is to the disadvantage of the mammals involved.[27] Thus, under the

25. From the context of his comments, it appears that Representative Goodling sought to dispel any fear that the general "zero mortality" policy objective would in itself prevent the taking of marine mammals even if it were demonstrated that such taking would not be disadvantageous to efforts to achieve optimum sustainable population levels. The significant portion of his comments is as follows:

"The phrase 'zero mortality and serious injury rate' has no other legislative fiat, directive, impact, or binding obligation on the part of the Secretary to reach for, strive for, and/or obtain a zero mortality goal by the potential or actual elimination of this Nation's commercial fishing industry or by the elimination of certain fishing techniques, such as the purse-seine method, *simply to satisfy an expression of a general policy objective.* We

all desire that marine mammal mortalities be reduced significantly—and as fast as possible—but there must be an appropriate balancing of equities between the two extremes of a zero mortality rate and elimination of a commercial fishing industry." 118 Cong.Rec. 34643 (1972) (remarks of Rep. Goodling) (emphasis added).

26. Substantially the same language is found in the House Committee Report, H.R.Rep.No.92-707, *supra* note 7, at 24, U.S.Code Cong. & Admin.News 1972, p. 4157, and in the Conference Committee's section-by-section analysis of H.R. 10420, 118 Cong.Rec. 34640 (1972).

27. See part II–B, *infra,* and part I–A, *supra,* discussing 16 U.S.C. §§ 1373(a) and (d).

scheme of the MMPA, even use of the best technology available cannot justify results inconsistent with the purpose of the Act. Accordingly, defendants' assertion must be rejected.

■ Finally, defendants rely on a statement made by Representative Dingell, Chairman of the House Subcommittee, during an oversight hearing two years after the enactment of the MMPA. Chairman Dingell stated that a "rule of reason" would be applied to the operation of the MMPA and that "[i]t was not our intention that commercial fishing be brought to a halt."[28] The Court notes first that there is nothing in Representative Dingell's statement contrary to the Court's view of the Act. It is clear that as long as the primary goal of the Act, to protect marine mammals, is served, commercial fishing can continue. Were this not the case, Congress would not have given the agency the power to modify the moratorium on the taking of marine mammals through the issuance of regulations and permits. In any case, the Court notes that remarks such as these, made by an individual member of Congress after the passage of the Act, cannot be given effect to set aside the plain meaning of the Act. *See National Woodwork Mfrs. Ass'n. v. NLRB*, 386 U.S. 612, 639 n.34, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357, 375 (1967); G. Folsom, *Legislative History* 36 (1972).

■ In conclusion, the Court finds defendants' contentions concerning the meaning of the Act unconvincing. The MMPA does not direct the defendants to afford porpoise only that amount of protection which is consistent with the maintenance of a healthy tuna industry. The interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured.

**B.** *Before the Agency can Prescribe Regulations to Provide for the Taking of Marine Mammals, It Must Find, Inter Alia, that the Expected Impact of Such Regulations on the Optimum Sustainable Population of the Species Involved is not to the Disadvantage of the Animals.*

■ Having established that the primary goal of the MMPA is to ensure the well-being of porpoise and other marine mammals, the Court now turns to the agency's performance of its specific responsibilities with respect to the issuance of regulations for the incidental taking of marine mammals. As discussed briefly in part I–A, *supra,* the agency's responsibilities in prescribing such regulations are set out in 16 U.S.C. § 1373, which, consistent with the basic theme of the Act, requires the agency to proceed slowly. This approach was adopted by Congress in light of the grave uncertainties as to whether porpoise and other marine mammal populations are in danger of extinction or depletion as a result of man's activities. Thus, the House Committee report states:

"In the teeth of this lack of knowledge of specific causes, and of the certain knowledge that these animals are almost all threatened in some way, it seems elementary common sense to the Committee that legislation should be adopted to require that we act conservatively—that no steps should be taken regarding these animals that might prove to be adverse or even irreversible in their effects until more is known." H.R.Rep.No.92–707, *supra* note 7, at 15, U.S.Code Cong. & Admin.News, 1972, p. 4148.

With this in mind, Congress established, in sections 1371(a)(3)(A) and 1373(a) of the Act, a precondition to the issuance of any regulations which provide for the taking of marine mammals: the agency must be *assured,* prior to adopting such regulations, that the taking provided for will not be to the disadvantage of the marine mammals involved and is otherwise consistent with the purposes and policies of the MMPA.[29]

---

**28.** *Hearings on Oversight of the Marine Mammal Protection Act of 1972 before the Subcommittee on Fisheries and Wildlife Conservation,* 93d Cong., 2d Sess., ser. 92–24, at 22 (1974).

**29.** As explained by the Conference Committee, this imperative to proceed knowledgeably and cautiously "establishes the basic theme of this Act. . . . It requires, in effect, that limita-

Moreover, Congress required the agency to make this determination on the basis of certain critical information, including the estimated impact of the proposed taking on the effort, mandated by the Act, to achieve an optimum sustainable population for each species of marine mammals.[30] Congress was also careful to provide that if, on the basis of this information, the agency is able to determine that regulations providing for the taking of marine mammals would serve the purposes of the Act, then the public must be given an opportunity to review that determination and the facts supporting it. Thus, as discussed in part I–A, *supra*, section 1373(d) of the MMPA directs the defendants, *inter alia*, to publish and make available, prior to conducting public hearings on the proposed regulations:

 (1) a statement of the estimated existing population levels of the species concerned;

 (2) a statement of the expected impact of the proposed regulations on the optimum sustainable population of those species;

 (3) a statement describing the evidence upon which such regulations are based.

After placing this obligation on the agency to discover and make available critical information prior to issuing regulations under section 1373, Congress then established a mechanism for gathering this information by: 1) authorizing and directing the agency to make grants to persons or institutions for research in subjects relevant to the protection and conservation of marine mammals, see § 1380; 2) establishing the Marine Mammal Commission to assist the agency in carrying out the purposes of the Act, see

§ 1401; and 3) ordering the MMC to establish a Committee of Scientific Advisors on Marine Mammals to serve as an expert consulting body to the Commission, see § 1403.

Nonetheless, Congress foresaw the possibility that, in given situations, there would be a lack of scientific information as to whether a proposed level of taking would be to the disadvantage of the marine mammals involved. House Subcommittee Chairman Dingell explained the consequences of this possibility:

> "Before issuing any permit for the taking of a marine mammal, the Secretary must first have it proven to his satisfaction that *any* taking is consistent with the purposes and policies of the act—that is to say, that taking will not be to the disadvantage of the animals concerned. *If he cannot make that finding, he cannot issue a permit. It is that simple.*" 118 Cong.Rec. 7686 (1972) (floor remarks) (emphasis added).

This conclusion is supported elsewhere in the legislative history. For example, the House Committee rejected, as inflexible, a proposed amendment providing for a strict two-year moratorium on the taking of most types of marine mammals, noting in support of its decision that "[a]s a practical matter, with regard to practically all of the species and stocks involved, there will exist a *de facto* moratorium for at least two years, and *very probably longer.*" H.R. Rep.No. 92–707, *supra* note 7, at 20, U.S. Code Cong. & Admin.News 1972, p. 4153 (emphasis added). This was because, as the Committee explained, (1) regulations providing for the taking of marine mammals

---

tions be established which will be designed to act for the benefit of the animals in question." 118 Cong.Rec. 34640 (1972) (section-by-section analysis of the MMPA prepared by the Conference Committee).

**30.** The reason for this requirement is obvious: only by knowing whether the population level would be reduced to a less-than-optimum level as a result of the taking could the agency determine whether such taking would be to the "disadvantage" of the animals involved. Though it may seem equally obvious that it can never be to the advantage of an individual animal to be killed, the Conference Committee

explained those circumstances in which some taking would be appropriate:

> "While clearly it is not to the benefit of an individual animal to be taken, the Committee was persuaded by overwhelming scientific evidence that there are, in fact, cases in which animal species or stocks may be benefited by removing excess members. *In these cases,* the Secretary will establish appropriate limitations which will permit the taking of *these* animals." 118 Cong.Rec. 34640 (1972) (section-by-section analysis) (emphasis added).

could only be prescribed on the basis of scientific evidence affirming that such taking would not be to the disadvantage of the animals, and (2) "with respect to almost every species and stock of animals today, there is little evidence to indicate what should be done one way or the other, and . . . the development of this evidence will take time—in most cases more than two years." *Id.*

With this understanding of the standard which section 1373 of the Act imposes on the federal defendants, the Court now considers whether the agency has met its obligations. As discussed in part I–B, *supra,* the agency's 1974 notice of intent to prescribe regulations governing the 1975 fishing season failed to include both a statement of the existing population levels and a statement of the expected impact of the regulations on the optimum sustainable population levels. On September 8, 1975, defendants published a notice of intent to prescribe regulations for the 1976 season which included existing population estimates for the two species which account for approximately eighty-two per cent of the total annual porpoise kill. But the agency again failed to provide estimates of the expected impact of the regulations on the optimum sustainable population levels, since it was unable to determine what the optimum sustainable population of each species was. However, the agency did state that "[t]here is no evidence that the porpoise populations would substantially increase or decrease as a result of the regulations and reissuance of [ATA's] general permit." 40 Fed.Reg. 41536 (1975). See part I–B, *supra.* Plaintiffs insist that this statement and others to the same effect are "patently deficient" in light of what the MMPA re-

quires. In response, defendants take the position that:

"[t]he agency's statements are not, as claimed by plaintiffs, 'patently deficient.' There was full disclosure of what NMFS knew about porpoise populations and about the impact of tuna fishing on porpoise. Where there were unknowns these were set out forthrightly." [31]

For the reasons set forth below, the Court agrees with plaintiffs that defendants' statements are clearly insufficient to meet the requirements of the Act.

First, "what NMFS knew about porpoise populations and about the impact of tuna fishing on porpoise" was at best a statement of the expected impact of the 1976 regulations on the *existing* porpoise population levels. Yet, the population goal articulated by the Act is not just a stable population, but rather, the optimum sustainable population for a given species. Therefore, Congress clearly could not have intended that the agency authorize the taking of marine mammals merely on the basis of the knowledge that present population levels would be unaffected, since it is precisely these existing population levels which, Congress feared, are dangerously low. Congress accordingly required that the agency act only on the basis of the very knowledge which the agency admits is unknown: the effect of any proposed taking on optimum sustainable population levels.

Second, although the agency acted in good faith in stating openly what it did not know, the issue here is not "good faith," but instead the action which the agency authorized in spite of its admitted lack of knowledge. In light of the Act's requirements, the defendants' conduct was in violation of both the letter and the spirit of the MMPA.[32] The Court recognizes, as defend-

---

**31.** Brief for defendant-intervenors in support of their cross-motion for summary judgment and in opposition to plaintiffs' motions for summary judgment, at 32.

**32.** Defendants make the argument that the phrase in section 1373(a) which directs the Secretary to prescribe regulations under that section "on the basis of the best scientific evidence available" excuses a failure to assess the impact of any proposed taking on optimum

sustainable population levels if that information cannot be obtained from the best evidence available. The Court rejects this argument. This phrase simply means that if the agency comes to the conclusion that a proposed level of taking will not be to the disadvantage of the marine mammals involved, then that conclusion must be based upon and supported by the best scientific evidence available.

ants point out, that the task of defining optimum sustainable population levels will be difficult; it is also clear that Congress itself realized that considerable time—probably more than two years—would be needed to complete this task. See pages 310–311, *supra.* However, it was Congress' plain intention that, until such time as these difficult estimates could be made, the status quo of the porpoise—not that of the tuna industry—should be preserved.

Defendant-intervenors have argued exhaustively that the plight of the porpoise will actually worsen if NMFS is ordered to do what plaintiffs assert and this Court believes the MMPA clearly requires it to do; for, they argue, such compliance would drive a substantial number of domestic purse-seine vessels and crew members to ships of foreign nations, where there is little or no official concern for porpoise protection. While the basis for this speculation is highly questionable,[33] it is, in any event, not the proper role of this Court to restructure congressional directives, the possible consequences of which were undoubtedly considered, and accepted, by both houses of Congress and the President of the United States.

■■■ The Court therefore holds no more than the Act clearly commands: that NMFS must publish and make available to the public, prior to or concurrent with publication of notice of its intent to prescribe regulations under section 1373 of the MMPA, reasonable estimates of (1) the existing population level of each species of porpoise affected by the proposed regulations, (2) the optimum sustainable population of each of these species, and (3) the expected impact of those regulations on the effort, mandated by the Act, to achieve an optimum sustainable population level for

each species. After publishing each of these (and all other required) estimates and conducting public hearings on the proposed regulations, the NMFS must then determine whether, based on these estimates and hearings, the total impact of the proposed taking would be to the disadvantage of the marine mammals concerned. At that time, regulations may be promulgated only if the agency is assured that the taking provided for therein will not be to the disadvantage of the animals and will be otherwise consistent with the purposes and policies of the MMPA.

C. *Each Applicant for a Permit Must Demonstrate that the Taking Under Such Permit Will Serve the Purposes of the MMPA; Furthermore, any Permit Issued Under the Act Must Specify the Number and Kind of Marine Mammals Which are Authorized to be Taken.*

■■■ As briefly discussed in part I–A, *supra*, section 1374 of the MMPA governs the process of issuing permits for the taking of marine mammals and provides, as does section 1373 with respect to regulations, specific safeguards for the protection and conservation of marine mammals. Section 1374(d)(3) imposes a burden on the applicant for any general permit to show that a proposed taking will be consistent with the purposes of the Act. The House Committee Report explains that this requirement prevents a permit from being issued unless the applicant can prove that the taking authorized by the permit would not work to the disadvantage of the marine mammals concerned. See part I–A, *supra.* In the instant case, it is clear that defendant-intervenor ATA failed to sustain, or to attempt to sustain, the burden imposed by section

**33.** Plaintiff EDF points out that even if American vessels were to register under foreign flags, it is doubtful that mere foreign registration would enable these vessels to avoid the obligations of American laws. If the law of the flag is to control, the flag must be more than one of convenience—the vessel must effectively cut its ties with the United States. *E. g., Lauritzen v. Larsen,* 345 U.S. 571, 587, 73 S.Ct. 921, 930, 97 L.Ed. 1254, 1270 (1953). Moreover, as

plaintiffs point out, a major incentive for the transfer of the American fleet to foreign flags is removed by enforcement of the foreign import provision of the MMPA, 16 U.S.C. § 1372(c), which provides, *inter alia*, for a ban on the importation of fish caught in a manner which does not meet United States standards. See brief of plaintiff EDF in response to defendants' cross-motions for summary judgment, at 21–29.

1374(d)(3). Although the ATA did estimate in its 1976 application that 85,060 incidental porpoise mortalities would occur during the 1976 fishing season, it failed even to discuss whether this number of killings would be to the disadvantage of the porpoise.

Section 1374(b)(2)(A) of the Act requires further that any permit issued by the agency specify "[t]he number and kind of animals which are authorized to be taken or imported." See part I–A, *supra.* It cannot be contested that the 1976 general permit which the agency granted to defendant-intervenor ATA violated this explicit statutory command.[34] Even though it was given a projected porpoise mortality figure of 85,-060, the agency decided, in contravention of the Act, to grant ATA an unrestricted general permit, without limitation as to number or kind.

**34.** Defendants argue that the following sentence from the legislative history indicates that Congress did not intend that the explicit requirement of section 1374(b)(2)(A) should apply to the tuna industry:

" . . . At the current time, it appears to the [House] Committee that the tuna fleet would be an appropriate recipient of general permits, under the authority of Section 103(i) of Title I, keyed not to specific numbers of porpoises which might be taken, but to the techniques that should be used in fishing operations." H.R.Rep.No.92–707, *supra* note 7, at 21, U.S.Code Cong. & Admin.News 1972, p. 4153.

Plaintiffs respond to this contention by pointing out that the language in question was written at a time in the development of the bill before the two-year grace period for commercial fishermen had been formulated. As noted above, the tuna industry had assured Congress that, given two years, it could solve the porpoise problem with technological advances. Accordingly, the industry needed a general permit in the interim to continue operations as normal. The House Committee complied by providing that permits should be granted to commercial fishermen which were "keyed not to specific numbers . . . but to the techniques that should be used in fishing operations." The final version of the MMPA, of course, eliminated the need for a permit for tuna fishermen during the first two years by providing for the two-year grace period and interim regulations regarding "techniques and equipment." See section 1371(a)(2).

Plaintiffs' argument is convincing. In any event, this Court cannot use indications in the legislative history to override the clear language of the statute. *FTC v. Manager, Retail*

## III. RELIEF

Having established that the federal defendants violated specific requirements of the MMPA [35] and consistently misinterpreted the general mandate of the Act, the Court turns finally to the question of relief. As to declaratory relief, plaintiffs request this Court to issue a declaratory judgment that the current regulations providing for the incidental taking of porpoise by tuna fishermen, and the general permit issued pursuant thereto, are void as contrary to law. Having found that the defendants acted unlawfully and contrary to their duties under the MMPA, the Court will grant this request for declaratory relief.

As to injunctive relief, the prevailing parties urge the adoption of basically two alternative plans. Plaintiff Committee

*Credit Co.*, 169 U.S.App.D.C. 271, 278, 515 F.2d 988, 995 n. 14 (1975).

**35.** Plaintiffs allege that in addition to the violations discussed by the Court above, defendants have failed to meet their responsibilities under the Act to ensure that imported fish have been caught in a method at least matching United States standards. The relevant portion of the statute reads:

"The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. The Secretary shall insist on reasonable proof from the Government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." 16 U.S.C. § 1371(a)(2).

Plaintiffs claim that the regulations implementing this portion of the Act, see 50 C.F.R. § 216.-24(e), make no provision for the "reasonable proof" required by the Act. The Court has reviewed the regulations and disagrees; specifically, it appears to the Court that, at least on its face, 50 C.F.R. § 216.24(e)(3) requires such proof. Plaintiffs have not gone beyond their original assertion. In these circumstances, the Court will not grant any relief with respect to this additional alleged violation. Of course, the Court assumes, as defendants represent, that vigorous implementation of the provisions in question will continue.

for Humane Legislation requests the Court to order an immediate ban on the incidental taking of marine mammals by commercial fishermen until such time as the agency has fully complied with the MMPA.[36] Plaintiff Environmental Defense Fund also urges that defendants be ordered to comply with the requirements of the Act, but proposes, in a "spirit of conciliation," a quota rather than an injunction until such compliance is achieved; under the terms of this proposed quota the 1975 porpoise mortality figure of 130,000 would be cut by half each succeeding year, thus limiting the incidental porpoise deaths for the current season to 65,000.

Commendable as EDF's proposal for conciliation may be, it cannot be adopted by the Court. The problem with the quota approach is that the Court has no more idea of what level of killing would be consistent with the MMPA than does the agency; thus, the setting of a quota would only ensure that the killing and injuring of porpoise in violation of the MMPA will continue, albeit at a decreasing rate. Moreover, it is hardly appropriate at this point to suggest that the incidental taking of marine mammals should be allowed to continue while the agency works toward compliance. Since the two-year grace period expired on October 20, 1974, the only limits the agency has placed on the general license to take marine mammals have concerned certain gear and fishing techniques; the agency has never set a limit on the number of porpoise which can be taken, despite the fact that incidental porpoise mortality during this period has been on the rise.

 Therefore, in light of the agency's continued failure to follow the mandate of Congress, the Court feels that the only appropriate relief at this time is to stop completely the incidental killing of porpoise unless and until the federal defendants are able to determine, as the Act plainly requires, that such killing is not to the disadvantage of the porpoise and is otherwise consistent with the intent of the MMPA.[37]

The Court realizes that the per-ton cost of catching tuna in some ocean areas may rise if purse seiners are prevented from fishing "on porpoise" until the requirements of the MMPA are satisfied. But steps which ensure the protection and conservation of our national environment must, almost inevitably, impose temporary hardships on those commercial interests which have long benefited by exploiting that environment. The people of this country, speaking through their Congress, declared that porpoise and other marine mammals must be protected from the harmful and possibly irreversible effects of man's activities. It is the obligation and intention of this Court to honor that declaration.

An Order in accordance with the foregoing shall be entered of even date herewith.

### DECLARATORY JUDGMENT AND ORDER

Upon consideration of plaintiffs' motions for summary judgment and defendants' cross motions for summary judgment and in accordance with the Memorandum Opinion of the Court of even date herewith, it is, by the Court, this 11th day of May, 1976,

ORDERED, that plaintiffs' motions for summary judgment be, and the same hereby are, granted; and it is

FURTHER ORDERED, that defendants' cross motions for summary judgment be, and the same hereby are, denied; and it is

FURTHER ORDERED, that the current regulations, general permit, and certificates of inclusion authorizing the taking of marine mammals incidental to commercial fishing activities be, and the same hereby

---

36. There can be no doubt that when an agency acts in violation of a statute, courts can overturn the regulations in question and enjoin further unlawful action thereunder. *E. g., Natural Resources Defense Council v. EPA*, 154 U.S. App.D.C. 384, 385, 475 F.2d 968, 970 (1973).

37. In the Order issued of even date herewith, the Court has delayed the effect of its injunction until May 31, 1976, and has required federal defendants to inform the Court within ten days as to how they will supervise compliance with this Order and Memorandum Opinion.

are, declared void as contrary to the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361 *et seq.*; and it is

FURTHER ORDERED AND DECREED, that the federal defendants be, and the same hereby are, enjoined from issuing any permit authorizing the taking of marine mammals by commercial fishermen unless and until the agency has complied with the Marine Mammal Protection Act and with the Memorandum Opinion of the Court of even date herewith; and it is

FURTHER ORDERED, that the effective date of this Order be, and the same hereby is, stayed until May 31, 1976, to provide adequate time for its implementation in accordance with the Court's Opinion of even date herewith; and it is

FURTHER ORDERED, that the federal defendants shall submit, within ten (10) days of the date of this Order, a plan indicating how they will supervise compliance with this Order and Memorandum Opinion of the Court.